**KENTUCKY TRANSPORT CORPORATION, Appellant,**

v.

**Bobby SPURLOCK, by His Committee, Polly Spurlock, Appellee.**

Court of Appeals of Kentucky.

Oct. 27, 1961.

Rehearing Denied March 23, 1962.

O. J. Cockrell, Jackson, Earl B. Rose, Beattyville, for appellant.

James S. Hogg, Jackson, for appellee.

STANLEY, Commissioner.

The appeal is from a judgment for $40,-000 for personal injuries sustained by Bobby Spurlock in an automobile accident which occurred about midnight on September 20, 1958, on highway No. 15 in Breathitt County. After the suit was filed, Spurlock was adjudged an incompetent by reason of serious brain injury, and the case was prosecuted by his committee.

A full statement of the evidence is required as justification for sustaining the appellant's contention that there was an absence of credible evidence to support the verdict of its negligence and that the evidence proved clearly the plaintiff was solely negligent.

The background and the foreground of the picture are clear, but the center is confused and distorted. In other words, the significant beginning and the tragic ending of the accident are clearly revealed, but the evidence of the critical intervening event is discordant and self-contradictory.

Earlier in the evening deputy sheriffs had stopped an automobile being driven by young Spurlock, who was accompanied by James Haddix. Officer Johnny Bush testified that Haddix was arrested for drunkenness and taken to jail, but Spurlock showed no evidence of intoxication. Haddix asked Spurlock to take his car home and to get his father to come and get him out of jail. At the jail Haddix asked the officers to see if Spurlock had taken his car home. They investigated and found that he had not. Whether Bush and other deputy sheriffs went out especially to look for Spurlock or to patrol the highway generally is not clear. Sometime during the night they saw Spurlock going south from Jackson in Haddix's car. He went into Perry County and bought several cans of beer. The accident occurred while Spurlock was on the road going northwardly towards Jackson, somewhere near the village of Clayhole. At the point the highway is cut out of the hillside and is bordered on the west by a cliff. On the east is an embankment leading down to Troublesome Creek, which runs parallel with the highway. Here Fugate Creek enters Troublesome and the Fugate road crosses it and enters the highway. A short distance north of this point the highway makes a rather sharp curve to the west. On the east side at that point, between the highway and the creek, were several buildings and some stacks of lumber.

It is certain that Spurlock's automobile ran off the east, or right-hand side of the highway, as if he had "straightened out" the curve. It went down the embankment for 100 or 125 yards, knocked over two stacks of lumber, then rolled over. Spurlock suffered serious injury. Five cans of iced beer and a stick of dynamite were found in the wrecked car.

When the plaintiff, Bobby Spurlock, was called as a witness, the defendant objected on the ground of his adjudged mental incompetency and because he was being offered as an exhibit to get the sympathy of the jury. The court permitted him to testify under leading questions. It would appear that the court should have ruled he was an incompetent witness. See City of Covington v. O'Meara, 133 Ky. 762, 119 S.W. 187; Wigmore on Evidence, §§ 492, 494. It is enough to say, however, that the young man's brief examination revealed such confusion in his recollection that in our review of the evidence his testimony must be disregarded as untrustworthy.

The plaintiff's case rested largely on the testimony of Deputy Sheriff Johnny Bush. He testified that Spurlock passed him "at the upper end of the straight line" (apparently the south end) of the road; the appellant's tractor-trailer truck was ahead of him "about a foot or so" over the center line; Spurlock "went to pass him and he blowed his horn or blinked his lights, I won't say which, maybe both, and he got two wheels off the pavement to pass and this truck swung over and then swung back and I don't know what happened then." The truck was going 35 or 40 m. p. h. and Spur-

lock "about 50 or 55." As Spurlock started to pass the truck, said the witness, its driver pulled over to the right and then back to the left of the center line, so "there wasn't room for a bicycle more than to pass." The witness could not see whether the car and truck collided. He stopped on the side of the road where Deputy Sheriff James Hudson was parked and told Hudson "to see if you can stop that car; we are supposed to pick it up." Hudson "took out," and Deputy Sheriff Kilburn "came out in his car and followed on through." It is not shown where these officers were located in relation to the scene and no explanation is offered why all of this was being done when Bush had just seen Spurlock crowded off on the left side of the road by the truck. The three officers went on and found the truck stopped on the side of the road around the curve. When they asked the driver if he was having trouble, he replied that "a car went over the hill." The officers then went down to the wrecked automobile.

Reverting to the accident, Bush testified, "I know he [the truck driver] crowded him off on the left side, but I don't know what happened on the right side." In the course of cross-examination, Bush insisted, first, that Spurlock was "fixing to pass when he got off the road," and then that he "was passing" the truck when it pulled over to the *left side* of the highway. This would have put the car over against the cliff. He offered no explanation as to why it came about that Spurlock's car went off the *right-hand* side of the highway and down the embankment.

The hostility and impatience manifested by the witness on cross-examination and his inconsistent and contradictory answers greatly weaken the probative value of his evidence. Moreover, about two weeks before the trial Bush made a statement to the defendant's attorney, O. J. Cockrell, as to how the accident happened. It was taken down by a stenographer, and the accuracy of her notes was confirmed by Bush when she read them back to him. On this occasion, according to the testimony of Mr. Cockrell and his stenographer and the transcript of the notes, Bush stated, among other contradictions, that Spurlock was "driving about 60 miles an hour around that curve about that time and he passed me and an A & P truck [appellant's] was in front of me and he passed that, and I saw him go around the curve and at the time there was plenty of room to pass the A & P truck and it was on its side of the road. Bobby Spurlock's car, when he came around me, went off the road on the right-hand side of the road and in the direction we were both traveling, and the left wheels were on the shoulder of the road and was that way when it started around the truck and then as it was going around the truck there was plenty of room for it to go by and then he went on down the road."

Bush denied making such statements to Mr. Cockrell and his stenographer. They testified he did and produced the statement. While the contradictions contained in the statement have no independent testimonial value, they ring true and add to the cumulative record of the incredulous story of Spurlock's car having been crowded over against the cliff on the left side of the road, whereas it had certainly run off the embankment on the right side.

Deputy Sheriff Hudson testified that he was parked on the side of the road when the defendant's truck passed traveling in the center of the highway, Spurlock "dodged off the left-hand side of the road making about fifty-five to sixty miles an hour and started to go on around, and when he got about half way around the truck there was two or four feet between them at that point and at that time I did not see the front of the truck and Johnny Bush pulled in front of me blocking my view and he told me to try to catch that car. He said this was the same car that we had been told to look for." The witness did not see the car leave the highway. He testified that the tracks of Spurlock's car were on the right shoulder of the road and ran from 100 to 110 feet "along the edge of the bank and

then went over the hill 125 yards before striking the stacks of lumber." This witness and other officers examined the automobile and the truck and found no sign on either that indicated they had touched.

The driver of the defendant's truck was introduced by the plaintiff, stating it was for the purpose of cross-examination, although he was not a party to the suit. He identified the ownership of the truck and his employment. He was asked concerning signals that Spurlock may have given before passing him, and stated the first he knew of Spurlock trying to pass was when his headlights were reflected in the truck's mirror. On examination by the defendant's counsel, the witness stated the car passed the truck safely on the straight stretch of road and went out of sight around the curve. He came in sight of it again, and saw Spurlock's automobile skid and go over the embankment on the right side.

The defendant's motion for a directed verdict was overruled. It then introduced two state troopers, Robert Franklin Dees and Donald Goebel, who had arrived at the scene soon after the accident. They found automobile tracks only on the dirt or berm on the right side of the road where the car had left the paved surface and gone over the embankment. There is contradiction whether the three deputy sheriffs then present, Bush, Hudson and Kilburn, stated to the troopers that no one had seen the accident.

The foregoing is the full story. Always the force of testimony depends on its strength to evince the truth of a matter in the light of all the indubitable circumstances and conditions. In the present case such light overshadows the testimony of Bush and Hudson that Spurlock was crowded over to the left of the defendant's truck in passing, notwithstanding the physical fact that his car ran off the right-hand side at or near a curve in the highway. In short, the testimony tending to show negligence on the part of the defendant is not evidence which has the quality of proof,

consisting of "fact and reason co-operating as co-ordinate factors" and inducing conviction of the truth, which is a generally recognized definition of probative evidence. Globe Indemnity Co. v. Daviess, 243 Ky. 356, 47 S.W.2d 990, and many later cases, among them Coney Island Co. v. Brown, 290 Ky. 750, 162 S.W.2d 785; Couch's Adm'r v. Black, 301 Ky. 24, 190 S.W.2d 681; Thornberry v. Smith, Ky., 346 S.W.2d 727. Doubtless, natural sympathy of the witnesses for the young man who had suffered so tragically had great influence on their memories.

The hard truth of the matter is that this verdict, rendered by ten jurors, is so flagrantly against the weight of the evidence that it can be accounted for only as having been rendered through intense sympathy for the unfortunate young man. Perhaps also a very bad and prejudicial instruction concerning the defendant's duties was a contribution. We need not go into that or the question of contributory negligence.

■ We have always recognized it to be the province of the jury to weigh the evidence. At the same time we recognize that where there is no evidence of probative value, as may be determined by the court, to support a cause of action or a defense or to support a verdict, the court should direct a verdict accordingly. Nugent v. Nugent's Ex'r, 281 Ky. 263, 265, 135 S.W.2d 877; Wadkins' Adm'x v. Chesapeake & O. R. R. Co., Ky., 298 S.W.2d 7. Such is this case.

■ The defendant moved for a judgment notwithstanding the verdict on the ground of the failure of the trial court to grant its motion for a directed verdict. CR 50.02. Since we are of opinion that the evidence did not warrant the verdict, we reverse the judgment and direct that the court now sustain the motion for a judgment notwithstanding. L. & N. R. Co. v. Taylor, Ky., 290 S.W.2d 608; Hoskins v. Hoskins, Ky., 316 S.W.2d 368.

Judgment reversed.