**COLONIAL LIFE & ACCIDENT INSURANCE COMPANY, Appellant,**

**v.**

**Zelda WAGNER, Appellee.**

Court of Appeals of Kentucky.

May 1, 1964.

Rehearing Denied Sept. 18, 1964.

Stoll, Keenon & Park, Lexington, for appellant.

Frank G. Gilliam, William S. Black, Lexington, for appellee.

MOREMEN, Judge.

On January 11, 1960, Warren G. Shockley walked into the Phoenix Hotel in Lexington where he shot and killed Warren F. Wagner, an employee of the hotel. Shockley was indicted for murder. At his trial on this charge, one of his defenses was that he was of unsound mind and without sufficient reason to know right from wrong, or that as a result of mental unsoundness he had not had sufficient will power to govern his action because of some insane impulse which he could not resist or control. The court instructed on the charge of murder, mental capacity to commit the crime and voluntary manslaughter. The jury found him guilty of voluntary manslaughter and fixed his punishment at ten years' confinement. Shockley had contended during the trial that Wagner had been associating with his wife for a period of about seven months despite the fact that he had warned him on several occasions to discontinue seeing her.

At the time of his death, Wagner was insured under a group policy issued by appellant, Colonial Life & Accident Insurance Company, and his widow, appellee, Zelda Wagner, was the beneficiary. She sued on the policy which contained this provision: "The insurance under this certificate shall not cover death or other loss caused or contributed to * * * (4) by injuries intentionally inflicted upon the Insured Employee by any other person." Upon trial of the civil suit the contention was again made that the condition of Shockley's mind at the time he killed Wagner was such that he could not intentionally commit the offense. In support of this contention appellee testified that Shockley had made a declaration to her relative to his state of mind, that prior to the shooting "he got spells where he did not know what he was doing," and that he once "found himself there (at the deceased's place of employment) and when he came to himself he was looking around the corner at my husband * * * and he didn't know what to do, but he left the place as quickly as he could."

The deposition of Shockley was taken and he attempted to explain the condition of his mind at that time, as follows:

"Q. Did you have knowledge of what you were doing or the effect of your act? A. That's hard to answer. I suppose if I had I wouldn't have done it.

"Q. Are you able to tell what was your state or condition of mind at the time this occurred? A. Well, I don't know how you would put it. Some one can keep on pushing you and drive you to do something. I warned the fellow to leave her alone. I just had no control.

"Q. Were you beyond any self-control at the time? A. I don't know."

However, when asked whether or not the killing was intentional, Shockley repeatedly replied that it was.

Dr. Graham Dimmick, professor of applied psychology at the University of Kentucky, and who had also engaged in the practice of clinical psychology, testified that he had examined Shockley for approxi-

mately two hours after he had been charged with the killing of Wagner. In response to a hypothetical question based upon that interview and upon other evidence which had been introduced at the trial as to whether Warren Shockley was, at the time of the shooting, capable of forming a rational intention to commit the act, Dr. Dimmick answered that in his opinion he was not capable of having a rational intention to do what he did. Dr. Dimmick also testified under cross-examination:

"Q. You didn't think Warren Shockley was insane, did you? A. I did not say that.

"Q. And you did not think so at the time of your interview, did you? A. Not insane, as you refer to it, no.

"Q. Do you know what Warren Shockley, in giving his deposition, swore under oath, when he was asked this question: 'The injury which you inflicted on him was, you would say intentional?' and that he answered 'yes' * * * did you know that? A. No, I did not know about that.

"Q. If that is true, do you know now whether this man was capable of rational intent to perform the act of which he was accused? A. Well, I am not sure, no."

An employee of the hotel testified that Shockley told him to tell Wagner that he would give him three days to get out of town or he was going to kill him.

The case was submitted to the jury under two instructions. The first one permitted the jury to find for the appellee if they believed that Shockley did not have sufficient mind or intellect to know the difference between right and wrong or to form a rational intent to shoot Wagner. The second instruction permitted the jury to find for the insurance company if the gunshot wounds which caused the death of Wagner were intentionally inflicted. The

jury found for the appellee and returned a verdict of $5,000, the amount of the policy.

Appellant contends that it was entitled to a peremptory instruction.

The main question in this case involves the proper interpretation of the exclusionary clause above quoted. The insurance company evidently undertook to assure only against accidental injuries or death or natural death. It did not insure against death from intentional injuries.

In law, there are many conditions under which a person may intentionally kill and not be subject to criminal punishment. A man may kill in self-defense. A soldier may kill under liberal rules. The executioner may kill with the sanction of the State. All of this destruction is intentional, but excusable. Similarly a person may be excused from penalty if he is insane at the time he commits a criminal act. He may do the act with every intention of consummating it, but if it is shown that he was mentally insufficient, he is excused from the imposition of the usual sanctions. The absence of punishment, however, does not retrospectively expunge the original intention.

In Deloache v. Carolina Life Insurance Company, 233 S.C. 341, 104 S.E.2d 875, a suit was brought on a double indemnity policy which contained an exclusion of double benefits in cases where the injuries were intentionally inflicted by another person. The facts were these: Deloache died from injuries inflicted by Burnett. Five days after the shooting, Burnett was committed to the South Carolina State Hospital. He was found to be mentally ill. The physician testified that a person mentally ill could intentionally do a thing even though he did not know right from wrong. He could intend to do a thing, but he was not responsible for doing it. The court held that under the policy, it did not matter whether Burnett was mentally or legally responsible for the act because the injuries which resulted in the death were intentionally inflicted by

another person and, therefore, the accidental death benefits provision of the policy did not apply.

In the case at bar we are not at all certain that enough evidence was introduced to formulate an issue as to whether or not Shockley was insane, but we need not pass upon this point because we are of opinion that under the terms of the policy the act was intentional and therefore specifically excluded from the coverage.

The judgment is therefore reversed and the case remanded for a new trial with an instruction that if the evidence is substantially the same, a directed verdict for appellant should be given.

Judgment reversed.