The WISER OIL COMPANY et al.,
Appellants,

v.

T. J. CONLEY, Appellee.

Court of Appeals of Kentucky.

June 12, 1964.

Allen Prewitt, Sr., Frankfort, Earl R. Cooper, Salyersville, for appellants.

Paul Combs, Prestonsburg, C. Kilmer Combs, Ashland, for appellee.

DAVIS, Commissioner.

In Wiser Oil Co. v. Conley, Ky., 346 S.W. 2d 718, we adjudged that T. J. Conley, who is the appellee here, should be allowed recovery for damage to his real estate resulting from appellant's use of waterflooding process in exploitation of an oil and gas lease. Upon a jury trial in the Magoffin Circuit Court, appellee obtained verdict and judgment of $15,000, separated as $6,000 for damage to coal underlying the land and $9,000 for surface damage. The oil company appeals from the judgment, asserting error in these respects: (1) The $6,000 award for coal damage was based on patently erroneous evidence, (2) the award for coal damage is flagrantly excessive and contrary to the evidence, (3) the $9,000 award for surface damage was found under an erroneous instruction permitting the jury to find permanent damage, and (4) the $9,000 allowed for surface damage is flagrantly excessive and contrary to the evidence.

As observed in our first opinion in this matter (346 S.W.2d 718), the original oil and gas lease was made in 1917. In the cited decision we recognized that appellants' liability for damages is limited to those damages attributable to the *new* method of exploitation. Thus, it is not proper for any damages to be assessed which may have resulted from activities under the lease prior to the waterflooding process.

It was established that applicable mining safety regulations require that a pillar 200 feet square be left around each drilled oil or gas well. At the time of trial there were 24 wells on appellee's land; eight of these had been drilled before the waterflooding method was employed. Since the waterflooding, sixteen wells have been drilled, of which eleven are water input wells and five are production wells. (There is some discrepancy in the evidence and in briefs whether there have been fifteen or sixteen new wells.)

For the appellee it was shown that more than thirty years ago he had mined some coal from his land for his own household use; there has never been any commercial coal mining on the tract. That mining operation is still available for viewing, and shows a coal vein of 29½ inches thickness at the mouth of the mine and 32½ inches at the back wall or facing. Appellee's principal coal witness said that the coal seam had about one-half inch "of parting or Jack rock" at the drift mouth, and that the parting had increased to about 2½ inches at a point 25 to 30 feet from the drift mouth.

The same witness for appellee gave his estimate of the amount of the coal underlying the land, based on his estimate that the coal underlying the area would average 29 inches in thickness. On that basis, the witness estimated there were 34.1 acres of recoverable coal under the land before the waterflooding method was put in use. He reckoned that 70% of that total could have been recovered, and gave his evaluation of the coal at $19,935.80. In making this calculation the witness conceded that he was using tonnage royalty as a factor, but said that he had made an allowance deduction of 20% for "future market."

It was shown that three core drills had been made on the appellee's land by Tom Burke; two of these test drills were at the instance of the appellants and one was performed for appellee. Core drill #1 reflected that seven inches was the maximum thickness of any coal seam found on the western portion of the land. Core drill #2 showed two seams on the eastern part of the land, one being twelve inches thick and another eleven inches; the latter seam was two feet below the former, reflecting a parting of two feet between the seams. The third core drill, performed for appellee, reflects five strata of coal: The first is 1 foot 4 inches at depth of 38 feet 7 inches; the next is 7 inches at depth of 50 feet 5 inches; the next is 3 inches at depth of 72 feet 8 inches; next is 4 inches at depth of 79 feet 1 inch; and the final stratum is 11 inches thick at a depth of

129 feet 3 inches. It was brought out that two logs made at the time of the drilling of some of the old wells reflected coal at thicknesses of three feet near one well and two feet near another; no coal was shown on the old well logs seen by appellee's witness Combs.

■ Moreover, appellee's witness Combs said that he could not advise any prospective purchaser to buy the appellee's coal rights, as a commercially feasible project, based solely on the information which the witness had at hand. Yet, the witness was permitted to *assume* the presence of coal under the tract at an average thickness of 29 inches. In face of the evidence of the core drills, coupled with the admission of appellee's expert witness that he based his estimates upon measurement at one place, considered with the statement of the same witness that he would not advise a client to purchase the coal rights without more investigation than the witness had made, we cannot escape the conclusion that appellee failed to carry his burden to offer evidence warranting belief that coal in commercial quantity lies under his land. It is fundamental that while it is the jury's province to weigh the evidence, the court will direct a verdict where there is no evidence of probative value to support an opposite result. The jury may not be permitted to reach a verdict upon speculation or conjecture. Kentucky Transport Corp. v. Spurlock, Ky., 354 S.W.2d 509; Myers v. Walker, Ky., 322 S.W.2d 109; 18 Ky. Digest, Trial, ■■.

However, the appellants offered evidence relating to the quantity and quality of the coal underlying appellee's land. Appellants' witness Spaulding made what he admitted to be a speculative estimate of the recoverable marketable coal under the land. The witness expressed serious doubt that coal in commercial quantity and quality lies under the land except in the area of five acres around the old mine site. He then estimated that the value of the five acres is $50 per acre, and put a value of $1 per

acre on the rest of the coal rights. In the opinion of Spaulding, one-half acre of the five acres valued at $50 was damaged, thus making his testimony fix $25 as damage for that, coupled with an overall damage of $1 per acre for approximately 68.59 acres. Taking into account the allowance of $25 for the half acre, this would indicate his estimate at $68.09 for the rest of the coal damage, or a total coal damage of $93.09. At the close of the case appellants offered to confess judgment for "the amount of damage fixed by Spaulding," without specifying what the amount was. This offer was refused by appellee.

■ Since the evidence did not warrant submission of coal damage beyond the amount admitted by appellants, the court erred in permitting the jury to assess damages on account of coal in any sum greater than admitted by appellants. If the evidence is substantially the same on a new trial, the court will limit coal damage recovery to the amount so admitted by appellants.

The appellee's farm was surveyed as containing 68.59 acres (as distinguished from 82.87 acres mentioned in the first opinion in this controversy). In asserting his damages to the surface, appellee presented evidence touching upon seven items of damage. We shall discuss them separately:

Numerous roads were constructed by appellants on the farm. These roads generally led from well to well and are described as "crisscrossing the property." The roads were not provided with drainage ditches, and in some instances cuts were made from six to eight feet in depth. There was evidence of considerable washing and erosion of the mud, rock, and gravel from the roads to lower areas of the farm. The linear distance of the roads is 3,633 feet. Although the roads average between six and eight feet in width, appellants' witness computed the acreage occupied by the roads as 1.251 acres, based on an average width of fifteen feet. The witness explained that this extra width footage takes into account

fills and erosion. It was emphasized for appellant that the roads were for limited use in moving equipment and not for continuous traffic.

There was evidence that some of the pipelines were placed above the surface. There is dispute as to the extent of this procedure—some of appellee's witnesses said these exposed lines were "all over the place." Appellants' evidence was that there were two segments of exposed pipe, one being 500 feet long and the other 50 feet in length. According to appellants' evidence, these exposed lines are in areas so steep that they could not interfere with the grazing of livestock or the cultivation of the land. The lines will not be needed when the oil is depleted.

The third item of damage is the oil said to be blown from the wells. For appellee it was shown that the oil is scattered about 100 feet around each well. It was said that the oil was then spread onto other areas by rains. It is not clear that any distinction was made in this testimony whether it resulted from the old or new oil wells. There is no showing that any permanent damage has been done by this incident.

For his fourth item of damage appellee showed that at each well there is a sludge pit. Into these pits are dumped the cuttings, sludge, and pumpings from the wells. The pits vary in size; some of them are 30 x 45 feet, others are smaller. It was shown that waste oil in the pits was usually burned by appellants' servants. One of the wells located in the bottom land had no sludge pit. Appellee introduced evidence that the pits overflowed, and that vegetation will not prosper in areas overflowed from the pits. Appellants' evidence reflects that the pits will present no problem when the oil operation is ended.

Salt water is the damaging agent next mentioned by appellee. He testified that he had had one water well "destroyed" with oil and salt water and another lost by reason of salt water alone. It is claimed that the removal of tubing used in drilling the wells let salt water escape into the strata holding pure water, thus contaminating the water table. Appellants insist that the claim on this point is exaggerated, and is occasional and temporary. There is no proof that salt water has permeated the fresh water strata, nor of permanent injury on this account.

Next, appellee contends that one of his ponds has been damaged—ruined he believes—because of oil on it. He explained that the oil appeared "every little bit" —that it had been on the pond "about four times I believe in the last year." The testimony falls short of characterizing this item as permanent.

Finally, it is said that appellants destroyed some good commercial oak timber and approximately one-half mile of fencing. Appellee estimated $1,500 would be required to restore the fencing; appellants' evidence tended to minimize this item by showing the fence could be restored for $50. Obviously, whatever fence has been damaged may be repaired. The evidence about the timber does not show the quantity or quality of timber, nor does it fix any monetary estimate of damage on this score.

For the appellants it was testified that all of the items discussed are temporary in nature. The extent of damage from them was said to be relatively slight. Appellants presented evidence that the entire oil operation would likely end within eight years. They also offered a witness who said that he is experienced in bulldozer operation, and that he could restore all of the farm substantially to its condition prior to the waterflooding process for $900. Appellee insists that the damages are permanent in nature.

Appellee's witnesses placed "before" and "after" values on the farm—excluding the coal. The "before" values ranged from $20,000 to $15,000; the "after" values ranged from $9,000 to $5,000. The difference in before and after values ranged from $10,000 to $12,000. As noted, the

jury returned a verdict awarding appellee $9,000 as permanent damage to the "surface" of the real estate.

The parties concede that different measures of damage are applicable in cases of temporary abatable injuries to land as distinguished from permanent injuries. City of Ashland v. Kittle, Ky., 305 S.W.2d 768; 7 Ky. Digest, Damages,  25 C.J.S. Damages § 84. Their point of departure is whether the instant case presents one for application of the rule relating to temporary or permanent injuries to real estate.

In view of the evidence that the entire oil operation is likely to cease within eight years, coupled with the evidence relating to the relatively minor costs required to restore the surface, we conclude that it was error to submit the case to the jury on any theory of permanent injury to the surface of the real estate.

It is also significant that appellee's approximately four acres of bottom land continue to be as productive now as before the waterflooding process.

If the evidence upon another trial is substantially the same as on the first trial, the court will peremptorily instruct the jury to award appellee $93.09 for damage to coal, plus such sum as it may believe represents the reduction in value of the use of appellee's farm from the date the waterflooding process was begun to the time of trial, plus such other sums as the jury may believe will reasonably be required to replace fencing destroyed, if any, and as will be reasonably necessary to restore the surface to a condition equivalent to that obtaining prior to the waterflooding process. Adams Construction Co. v. Bently, Ky., 335 S.W.2d 912.

Since the property owner's right of recovery in cases of temporary damage to real estate is not a single right of recovery, it is to be observed that the appellee shall not be precluded from seeking redress for any continued diminution in the value of the loss of use, or recurring costs for repairs and restoration, during such time as the waterflooding process shall continue, provided such action is timely filed. Chicago, St. L. & N. O. R. Co. v. Hicks, 249 Ky. 578, 61 S.W.2d 37; 1 C.J.S. Actions § 104e.

The judgment is reversed for proceedings consistent with this opinion.