NATIONWIDE MUTUAL FIRE INSURANCE COMPANY, Plaintiff–Appellant,

v.

John T. MAY Jr., Administrator of the Estate of Charlesetta May, Defendant–Appellee.

No. 87–6135.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 8, 1988.

Decided Oct. 28, 1988.

---

John G. Crutchfield (argued), Ewen, Mackenzie and Peden, Louisville, Ky., for plaintiff-appellant.

Donald Armstrong, Jr. (argued), Louisville, Ky., for defendant-appellee.

Before KENNEDY and WELLFORD, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

Plaintiff Nationwide Mutual Fire Insurance Co. ("Nationwide" or "Company") appeals the district court judgment, entered upon a jury verdict, finding Nationwide liable under the terms of a Homeowners Insurance Policy to defendant John T. May Jr., Administrator of the Estate of Charlesetta May ("Estate"), for fire damage at the insured premises. Nationwide reiterates on appeal the arguments made to the district court in a post-judgment motion: that the jury's verdict should be set aside because it was unsupported by the evidence; and that the court erred in awarding the Estate a recovery "to the full extent of the policy limits" because the damage issue was not pleaded or litigated. We conclude that the district court did not err in refusing to override the jury's verdict, but we agree with Nationwide that the court's damage award was premature. Accordingly, we affirm the district court judgment finding Nationwide liable on its insurance policy, but remand for further proceedings.

I.

Shortly after noon on January 31, 1986, the Louisville Fire Department responded to an emergency call reporting a fire at 7019 Woodhaven Road. Inside the burning home, firefighters found the dead bodies of the owner of the residence, Charlesetta May, and her twenty-two year old son, Daniel. Charlesetta did not die as a result of the fire, however; she had been killed by a shotgun blast, evidently at the hands of her son. Daniel then died of smoke inhalation in the ensuing fire.

A review of the events leading to the fire reveals that Daniel May had a history of mental illness. During the summer and

fall of 1985, he was examined by three psychiatrists and briefly stayed at two mental hospitals. The psychiatrists agreed that Daniel was psychotic in that his thought processes and perceptions were often divorced from reality. Daniel's psychosis was manifested in delusional thinking, auditory hallucinations, suicidal tendencies, and depression. The psychiatrists further stated that both medication and treatment were necessary for Daniel to recover, and that without them Daniel's condition would deteriorate. No evidence in the record suggests that Daniel received any treatment after September, 1985.

Toward the end of 1985, Charlesetta May became quite concerned with her son's changing behavior. He talked about suicide more frequently and did not like to be left alone. Charlesetta's concern ultimately turned to fear, so she asked Daniel's father, from whom she had been divorced for two years, if he would take Daniel into his home. John May Sr. agreed, and around Christmas of 1985, Daniel began sleeping at his father's apartment. To avoid leaving Daniel alone during the day, however, John Sr. would often drop Daniel off at Charlesetta's Woodhaven home in the morning and then pick him up after work.

Daniel's behavior continued to deteriorate. John Sr. testified that Daniel became increasingly withdrawn and often refused to shave or change his clothes. Daniel's parents became so alarmed during the week before the fire that they were prepared to take legal action to have Daniel involuntarily committed to a mental hospital.

On the morning of January 31, 1986, John Sr. dropped Daniel off as usual at Charlesetta's house. Charlesetta and another son, David, were also at home that day. At about noon David left the house, telling Daniel that he would not be gone long.

At 12:18 p.m. the Louisville police received a "911" emergency call from "John" May reporting a fire at 7019 Woodhaven. The voice was later identified from a tape recording as Daniel's. The fire department responded, found the house in flames, and began fighting the fire. David May returned shortly thereafter and alerted firefighters that his mother and brother were probably inside.

Firefighters found the body of Charlesetta May in the family room. The shotgun used to kill her was lying near her body. The police later learned that Daniel had borrowed the gun on the previous evening from a neighbor on Woodhaven under the pretense that he was going hunting. The fire was set in a rear bedroom with the aid of an accelerant, such as gasoline. Daniel's body was found in a third room; his clothes were also soaked with the accelerant, which suggested an attempt to set himself on fire. It was further determined that Daniel's clothes had caught fire before he collapsed. These circumstances led the authorities to conclude that Daniel May killed his mother and then died in the fire he had started.

The fire also inflicted extensive damage on the Mays' home, including damage from smoke, heat and water. Plaintiff Nationwide had insured the property since 1974 under a Homeowners Policy issued to Charlesetta May. The Administrator for Charlesetta's Estate, her son John May Jr., made a claim under the policy for damage to the structure and for personal property destroyed in the fire. Nationwide initially made payments discharging the mortgages on the house and also made advance payments of $4,500 to the May family. Before the claim was settled, however, the Company denied coverage relying on the following policy provisions:

"Insured" means you and the following who live in your household:

   a. Your relatives.

. . . .

We do not cover loss resulting directly or indirectly from:

. . . .

(7) intentional acts meaning a loss resulting from an act committed by or at the direction of an insured if there is intent to cause a fire.

Nationwide denied the claim on the theory that the fire was intentionally set by Daniel

May, who was living in his mother's household.

Nationwide then brought this declaratory judgment action in federal court. The Estate defended against the suit on two grounds: it claimed that at the time of the fire Daniel was not an "insured" under the policy, since he was "living" with his father, not his mother; and alternatively, the Estate argued that a serious mental illness precluded Daniel from formulating the "intent" necessary to invoke the "intentional act" exclusion. In response to the district court's interrogatories, the jury found: (1) that Daniel May *did not* "live" in his mother's household; (2) that Daniel *did not* understand the physical nature of the consequences of his act and *did not* "intend" to set the fire; and (3) that he *did not* "intend" to cause damage to the house. The district court entered judgment on the jury verdict in favor of the Estate, ordering Nationwide to "pay the full loss sustained ... to the full extent of the policy limits." Nationwide objected to both the jury verdict and the damage award in a motion for judgment n.o.v. or a new trial, which the district court denied, and this timely appeal ensued.

## II.

Nationwide's primary contention on appeal challenges the jury's verdict rejecting Nationwide's reliance on the "intentional act" exclusion in the Homeowners Insurance Policy. The district court submitted to the jury the following interrogatories:

### Question No. 1

Do you find from a preponderance of the evidence that Daniel May lived in the household of Charlesetta May on or about the date of the fire?

### Question No. 2

Do you believe from the evidence, without regard to whether he was capable of distinguishing right from wrong, both that:

(a) He understood the physical nature of the consequences of his act, and

(b) He intended to set the fire[?]

### Question No. 3

Do you find from a preponderance of the evidence that Daniel May intended to cause damage to the house on January 31, 1986?

The jury answered "No" to each question, and the district court entered judgment against Nationwide.

Nationwide bears a heavy burden in trying to upset the judgment based upon the jury verdict. To obtain reversal, Nationwide must show that the jury's answers to all three interrogatories were incorrect, for a proper "No" answer to any one of the three would defeat Nationwide's reliance on the intentional act exclusion. Moreover, the Company must achieve this result in the face of our limited review of the jury's conclusions. In a diversity case such as this, we look to state law for the standard with which to review a denial of a j.n.o.v. motion. *See Calhoun v. Honda Motor Co.*, 738 F.2d 126, 129 (6th Cir.1984). Under Kentucky law, the jury's verdict must be upheld if, "draw[ing] all fair and rational inferences from the evidence in favor of the party opposing the motion," the evidence is sufficient to sustain the verdict. *Id.* (quoting *Spivey v. Sheeler*, 514 S.W.2d 667, 673 (Ky.1974)). Although Kentucky courts thus recognize that "it is the jury's province to weigh the evidence," *Perry v. Ernest R. Hamilton Assocs. Inc.*, 485 S.W. 2d 505, 509 (Ky.1972) (quoting *Wiser Oil Co. v. Conley*, 380 S.W.2d 217, 219 (1964)), it is equally clear that the courts are duty bound to take a case away from the jury if the evidence does not "present a true issue of fact to the jury." *Wadkins' Adm'x v. Chesapeake & Ohio Ry. Co.*, 298 S.W.2d 7, 9–10 (Ky.1956).

The single controlling question on a motion for a directed verdict, either at the close of [a party's] evidence or at the close of all the evidence, is whether or not [that party] has sustained the burden of proof by more than a scintilla of evidence. "More than a scintilla" may be defined as evidence of probative value having fitness to induce conviction in the minds of reasonable men.

*Id.* at 9; *see also Perry,* 485 S.W.2d at 508 (party must introduce "substantial evidence of probative value" to avoid a directed verdict); *Wiser Oil,* 380 S.W.2d at 219 ("the court will direct a verdict where there is no evidence of probative value to support the opposite result."). Nationwide accordingly argues that the jury's findings that Daniel did not "live" with his mother and could not "intend" the fire and loss were not supported by evidence of the requisite quality, but were rendered solely out of sympathy for the May family. We conclude that the jury was justified in finding that Daniel's mental illness disabled him from intending to set the fire and cause the loss, and therefore affirm the district court's judgment.

Initially, we note that Kentucky law provides little guidance on the question of where Daniel "lived," as that term is used in a Homeowners Insurance Policy.[1] We find ample evidence in the record from which the jury could conclude that Daniel "lived" with his father, at least insofar as he spent nights at his father's apartment from Christmas, 1985, until the night before the fire. The more substantial question is whether Daniel nonetheless "lived" in his mother's "household," especially considering that he regularly returned to the house during the day while his father was at work and that he stored his personal property there. We have found no Kentucky case, however, construing the phrase "live in your household," and we are not persuaded that the cases cited by Nationwide provide a conclusive answer in this case.[2] In view of these uncertainties, and in view of our conclusion that the jury's verdict is sustainable on Daniel's inability to "intend" the fire and loss, we decline to address this novel question of Kentucky law.

"Intentional act" exclusions in the insurance policy context, on the other hand, have often been reviewed and approved by the Kentucky courts. *See, e.g., Colonial Life & Accident Ins. Co. v. Wagner,* 380 S.W.2d 224 (Ky.1964); *Davis v. Massachusetts Protective Ass'n,* 223 Ky. 626, 4 S.W. 2d 398 (1928); *Smith v. Federal Life Ins. Co.,* 219 Ky. 56, 292 S.W. 470 (1927); *American Accident Co. v. Carson,* 30 S.W. 879 (Ky.1895); *Willis v. Hamilton Mut. Ins. Co.,* 614 S.W.2d 251 (Ky.App.1981). Although the meaning of the term "intentional act" has not been precisely defined, the exclusion clearly does not require a specific intent to cause the injury suffered. *See Willis,* 614 S.W.2d at 252 (refusing to follow "third view" that required specific intent); *see also John Hancock Mut. Life Ins. Co. v. Tabb,* 273 Ky. 649, 117 S.W.2d 587 (1938) (provision excluding "homicide" from life insurance coverage interpreted not to require proof of specific intent to kill). The Kentucky courts have more generally concluded that an intentional act exclusion will be invoked when the injury is a foreseeable or expected consequence of the actor's volitional acts, and not merely fortuitous or accidental. *See, e.g., Woods v. Provident Life & Accident Ins. Co.,* 240 Ky. 398, 42 S.W.2d 499, 501–02 (1931). Consequently, the requisite intention may be proved either by direct evidence of "actual" intent, or it may be "inferred by the nature of the act and the accompanying reasonable foreseeability of harm." *Willis,* 614 S.W.2d at 252 (quoting *Pachucki v. Republic Ins. Co.,* 89 Wis.2d 703, 278 N.W.2d 898, 901 (1979)).

Nationwide argues that Daniel's intent must be inferred from the nature of his acts leading up to the fire. The Company particularly points to Daniel's decisions to borrow the shotgun and smuggle it into the

---

1. The district court also found no guidance in Kentucky law for the meaning of the term "lived" in this context. In its instructions to the jury, therefore, the court refused to define "lived," opting instead to allow the jury to render its decision under the jury's understanding of the everyday meaning of the word.

2. Nationwide relies on a Kentucky decision, *Old Reliable Ins. Co. v. Brown,* 558 S.W.2d 190 (Ky.

App.1977), and an earlier decision from this court, *Ocean Accident & Guar. Co. v. Schmidt,* 46 F.2d 269 (6th Cir.1931). Neither case, however, interprets the phrase "live in your household," and even if the policy provisions at issue therein are analogous, we find the facts of the instant case sufficiently dissimilar that the cited decisions are not controlling.

house, to spread and ignite the gasoline, and to call "911" to report the fire. Resolution of the intent question here, however, is complicated by the Estate's contention, which was supported by proof at trial and accepted by the jury, that Daniel's insanity precluded him from formulating the intent necessary to invoke the exclusion. The Estate thus challenges whether Daniel's acts arose from his "decisions," as the Company contends, or whether they were instead the product of his mental illness. To resolve this dispute, we will first review the confines of the "insanity defense" to an intentional act exclusion under Kentucky law.

Two older cases interpreting Kentucky law suggest that insanity is a complete defense to an intentional act exclusion. In *Bindell v. Kenton County Assessment Fire Ins. Co.*, 128 Ky. 389, 108 S.W. 325 (1908), the court held an insurance company liable under a fire insurance policy despite that the insured started the fire. Although the policy at issue in *Bindell* contained no intentional act exclusion, the court nonetheless stated that the insurer would not be held liable "if the destruction of the property was caused by the voluntary, fraudulent, corrupt, or wrongful act of the insured." *Id.* 108 S.W. at 326. In very broad terms, however, the court held that the insured's intent could be negated by proof of insanity:

> If [the insured], while insane, destroyed the insured property, the company cannot under the conditions of this policy escape liability for the loss upon this ground. Unless [the insured's] act in destroying the property was fraudulent, voluntary, or intentional, the company is bound.... Accepting this doctrine as sound, it necessarily follows that if the insured did not at the time have mind enough to know the nature or quality of his act, and was laboring under such a defect of reason as not to be responsible for his conduct, or as a result of mental unsoundness he did not have sufficient

will power to know right from wrong or govern his actions, that the destruction of the property by him would not relieve the company. *Under the conditions stated, the act of the insured '... could not be voluntary or intentional because he did not have sufficient mind and memory to do a voluntary or intentional act.*

*Id.* at 326 (emphasis added). Prior to *Bindell*, this court had also given a broad interpretation to the insanity defense in a Kentucky case. *See Corley v. Travelers' Protective Ass'n*, 105 F. 854 (6th Cir.1900). *Corley* concerned a claim under an accident insurance policy that specifically excluded intentional acts. The court stated:

> We think it is the true rule that if the [insured] was killed by one incapable of distinguishing right and wrong, or forming a rational intent to do the act, then the death would not be intentional, any more than it would be if it happened through some unforeseen accident.

*Id.* at 862. *Bindell* and *Corley* thus held that an act is not "intentional" under an insurance policy if the actor suffers from a mental defect that renders him unable to understand the nature or quality of his acts, unable to tell right from wrong, or unable to control his conduct.[3]

Nationwide argues, however, that this expansive view of the insanity defense in *Bindell* and *Corley* has been rejected by the more recent Kentucky decision in *Colonial Life & Accident Ins. Co. v. Wagner*, 380 S.W.2d 224 (Ky.1964). Wagner, who was insured under a group accident policy, was shot and killed by Shockley, who believed that his wife and Wagner had been "associating" for seven months. The widow Wagner later brought suit to collect on the insurance policy. The insurer denied coverage, however, relying on the policy exclusion of "injuries intentionally inflicted upon the Insured Employee by any other person." *Id.* at 225. The widow sought to defeat the exclusion by showing that at the

---

**3.** Although we conclude below that this broad understanding of the insanity defense to an intentional act exclusion is no longer the law in Kentucky, we note that it does find support in

cases from other jurisdictions. *See, e.g., Globe American Casualty Co. v. Lyons*, 131 Ariz. 337, 641 P.2d 251 (App.1981) (collecting cases).

time of the killing Shockley suffered from an insane impulse that precluded him from controlling his actions or knowing right from wrong, a theory which was viable under *Bindell* and *Corley.* Testimony of Shockley and a psychologist supported the theory, but Shockley undermined the widow's case when he stated that he killed Wagner intentionally. *Id.* Under these circumstances, the *Wagner* court held that the killing was "intentional" under the insurance policy, and that the insanity issue need not have been submitted to the jury. *Id.* at 226–27.

We agree with Nationwide that *Wagner* substantially narrowed the insanity defense approved by *Bindell* and *Corley.* The *Wagner* court specifically concluded that whether an act is intentional is a question distinct from whether the actor is legally responsible for his act. *See Wagner*, 380 S.W.2d at 226–27 (discussing with approval *Deloache v. Carolina Life Ins. Co.*, 233 S.C. 341, 104 S.E.2d 875 (1958)). The insured, therefore, may no longer defeat an intentional act exclusion by proof of a mental illness, such as an insane impulse, that merely precluded the actor from controlling his actions or knowing right from wrong. *Wagner* does not, however, render the actor's mental health completely irrelevant to the inquiry. Rather, it leaves undisturbed that prong of the *Bindell* standard under which an exclusion will be defeated if the actor "did not at the time have mind enough to know the nature and quality of his act." 108 S.W. at 326. The vitality of this aspect of *Bindell* has been implicitly recognized in two cases from other jurisdictions that have cited *Wagner* for the proposition that an act is intentional under an intentional act exclusion if the actor understands the physical nature of the consequences of his actions, regardless

of whether he can discern right from wrong. *See Johnson v. Insurance Co. of North America*, 232 Va. 340, 350 S.E.2d 616, 619–20 (1986); *Globe American Casualty Co. v. Lyons*, 131 Ariz. 337, 641 P.2d 251, 253 (App.1981). The converse of this formulation is that a person's actions will *not* be considered intentional if he is unable to comprehend the physical nature of their consequences, which we view as essentially the same standard remaining from *Bindell*.[4]

The district court instructed the jury in accordance with these principles. The court expressly required the jury to determine whether Daniel, "without regard to whether he was capable of distinguishing right from wrong, ... understood the physical nature of the consequences of his act," as well as whether he intended to set the fire and damage the house. We now review the jury's "No" answers to these questions.

Viewing the evidence adduced at trial in the light most favorable to the Estate, as we must, *see Calhoun*, 738 F.2d at 129, we conclude that the jury was entitled to find that Daniel was without sufficient mental capacity to understand the consequences of his acts. We are mindful of Nationwide's contention that the jury's verdict was entered out of sympathy for the surviving Mays. The prospect of sympathy, however, is not alone cause for reversal of a jury verdict. As the Kentucky court has said, "Perhaps the better basic approach is to consider the question of the directed verdict from the standpoint of the sufficiency of the plaintiff's evidence rather than the unconscionable aspect of a possible verdict in his favor." *Wadkins'*, 298 S.W.2d at 9. Reversal is permitted, therefore, only if the jury's verdict is not supported by "evidence of probative value hav-

---

4. This more limited view of the insanity defense also is supported by the case law from other jurisdictions. See, *e.g., Johnson v. Insurance Co. of North America*, 232 Va. 340, 350 S.E.2d 616 (1986) (collecting cases). Moreover, this interpretation of intentional act exclusions is consistent with longstanding Kentucky case law interpreting suicide exclusions in life insurance policies. Kentucky courts have held such exclusions inapplicable if the insured was so mentally deranged as to preclude him from understanding that he was taking his life or that his actions would probably result in his death, even if suicide is excluded while the insured is "sane or insane." *See, e.g., New York Life Ins. Co. v. Dean*, 226 Ky. 597, 11 S.W.2d 417 (1928); *Anderson v. Standard Accident Ins. Co.*, 205 Ky. 587, 266 S.W. 237 (1924); *Columbian National Life Ins. Co. v. Wood*, 193 Ky. 395, 236 S.W. 562 (1921).

226

ing fitness to induce conviction in the minds of reasonable men." *Id.* Considering the testimony of Daniel's behavior and the nature of his final acts together with the psychiatric evidence, which we review below, we hold that the jury's verdict was supported by sufficient evidence to survive the j.n.o.v. motion.

Dr. Darryl Franks, a board-certified psychiatrist, examined Daniel once in June or July of 1985. Daniel complained of a nonexistent growth on the back of his neck, which he believed caused others to ridicule him. He further admitted to feeling suicidal and having auditory hallucinations (*i.e.,* he heard voices). Dr. Franks diagnosed Daniel as "overtly psychotic," which he described as "out of touch with reality" and "misinterpreting reality," and he recommended immediate hospitalization because such an "individual is a high risk danger to himself." Dr. Franks testified that Daniel did not have sufficient mental capacity to know the physical consequences of his acts, and that he could not formulate a rational decision to cause an injury. On cross-examination, Dr. Franks admitted that he could not say precisely what went through Daniel's mind in January when the fire occurred, but he testified that without proper treatment, the condition diagnosed in July would continue to exist and get worse. Based on the lack of treatment in the intervening months, Dr. Franks concluded that the January 31 killing and fire were the result of Daniel's delusional thinking, and thus unrelated to reality or rational thought processes.

The Mays rejected Dr. Franks' recommendation to hospitalize Daniel, and as the doctor predicted, Daniel's condition failed to improve. Hoping that a change of scenery might benefit Daniel, his parents tried to send him on a vacation by bus to California, where his brother was stationed with the Air Force. During a layover in Denver, however, Daniel reportedly caused a disturbance and threatened to kill himself. He was taken into custody and hospitalized at Denver General Hospital for five to seven days until his return home could be arranged. Daniel was heavily sedated and flown by commercial airline to Cincinnati, where his father met him. They returned to Louisville, and Daniel was admitted to Central State Hospital.

The second expert to testify was Daniel's treating psychiatrist at Central State, Dr. Ennu Surrender, who saw Daniel three times in early September, 1985. Dr. Surrender diagnosed Daniel's illness as "atypical psychosis," one of the symptoms of which is that the person is "not in touch with reality." He testified that further observation was required and that Daniel should have remained hospitalized. Dr. Surrender stated that Daniel did not have sufficient mental capacity to understand the physical consequences of his acts or to formulate a rational decision. Moreover, he stated that without proper care and medication, Daniel's condition would deteriorate. On cross-examination, however, Dr. Surrender equivocated. He stated that as of September of 1985, Daniel "probably knew" that throwing a lit match on gasoline would start a fire, and that taking medication would help him get well. Both statements were inconsistent with his direct testimony. On redirect, Dr. Surrender repeated his direct testimony that Daniel "did not understand the needs to take medication and the need to get well."

Dr. Lovanda McClure Kynhoff was the third psychiatrist to testify. She saw Daniel once in September, 1985, and diagnosed him as having "some kind of psychotic disorder, meaning he was out of touch with reality." During the examination, Daniel repeated his delusional belief that he had a sore on the back of his neck which caused others to stare and laugh at him. Daniel denied having hallucinations, but from his behavior during their interview, Dr. Kynhoff concluded that Daniel was experiencing hallucinations. Dr. Kynhoff also observed that Daniel was experiencing much anxiety, and Daniel complained of an inability to sleep and recent memory loss. Dr. Kynhoff stated that at the time of their interview, Daniel probably had sufficient mental capacity to know what he was doing. However, she agreed with the other psychiatrists that Daniel's psychotic condition could not resolve itself without medi-

cation and treatment. In response to the cross-examination question whether Daniel would have known the result of igniting gasoline, Dr. Kynhoff stated that she could not answer the question, "because to someone who is psychotic their perceptions of what they are doing and meanings that those events have to them are very different from what you and I might have." She further testified that "the meaning and intent perceived or consequences of a behavior is not reality based," and that what a psychotic intends "may be totally unimaginable to any of us."

Considering the evidence in its entirety, we agree with the district court that whether Daniel was able to form the requisite intent to justify Nationwide's reliance on the intentional act exclusion raised a question for the jury to decide. In view of Daniel's unstable mental state, the jury could clearly conclude that his acts of killing his mother and setting the house and himself on fire were the products of a deranged mind. The psychiatric testimony, although not entirely consistent, supported the jury's further conclusion that Daniel was so deranged that he was unable to intend the fire or cause the loss. It cannot be doubted that Daniel was afflicted with a serious mental illness in September, 1985, which, the jury could believe based on the psychiatric evidence, deprived Daniel of the ability to understand the physical nature of the consequences of his acts. The experts also testified that Daniel's condition would not improve without treatment, and would probably get worse. By all accounts, the psychiatrists' prediction came true: the Denver incident and Daniel's behavior in late 1985 and early 1986 showed that his condition did deteriorate without the recommended treatment. Under these circumstances, the jury was justified in concluding that Daniel's bizarre acts on January 31 were not the products of a rational or aware mind, but were instead prompted by his mental disease. Accordingly, we hold that the jury's conclusions that Daniel did not have sufficient mental capacity to understand the physical nature of the consequences of his acts or to intend the fire and loss were based on "evidence of probative value having fitness to induce conviction in the minds of reasonable men." *Wadkins'*, 298 S.W.2d at 9. The jury's verdict, therefore, was supported by sufficient evidence to survive the j.n.o.v. motion, and the district court correctly held the Company liable under the insurance policy.

### III.

The district court's judgment also awarded the Estate "the total amount due under ... the policy of insurance." The court ordered Nationwide to "immediately pay the full loss sustained ... to the full extent of the policy limits." Nationwide claims on appeal that this damage award was improper because the Estate failed to counterclaim for the proceeds of the policy, or alternatively, because the damage issue was not fully pursued at trial. Because we agree that insufficient evidence was taken on the damage issue to support the district court's judgment, we reverse and remand for further proceedings.

■ Nationwide argues that the Estate failed to counterclaim for the policy proceeds, so that the issue was never properly raised. We conclude, however, that the Estate's Answer and Counterclaim, when "so construed as to do substantial justice," Fed.R.Civ.P. 8(f), were sufficient to satisfy the pleading requirements under Rule 8(a), Fed.R.Civ.P.

The Estate's Answer admitted the existence of the insurance policy and the occurrence of the fire, as set forth in Nationwide's Complaint. The Answer went on, however, to deny the applicability of the intentional act exclusion, and it specifically set forth the Estate's contentions that Daniel was not an "insured" under the policy and that he could not "intend" to set the fire or cause the loss. Having detailed its positions, the Estate then "demand[ed]" that the district court

immediately declare that the policy of fire insurance of CHARLESETTA MAY, was in full force and effect on the date and time of the alleged loss, and that [Nationwide] is required to immediately pay the full loss sustained by said In-

sured to her personal representative, to the full extent of the policy limits.

Although these allegations and the affirmative demand for relief were not explicitly repeated in the Estate's "Counterclaim," the Counterclaim did request relief "[a]s in [the] Answer to the Compalint (sic)," thus incorporating the demand for the policy proceeds. Under these circumstances, we conclude that the Estate's claim for the policy proceeds satisfied the requirements of "a short and plain statement of the claim showing that the pleader is entitled to relief, and ... a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a)(2) & (3). Accordingly, we hold that the Estate's Answer and Counterclaim were sufficient under the Federal Rules to raise the damage issue.

Furthermore, actions of the parties and the district court at trial confirm that the Estate's responsive pleading was sufficient to notify Nationwide that the proceeds of the policy were in issue. *See Colonial Refrigerated Transp., Inc. v. Worsham,* 705 F.2d 821, 825 (6th Cir.1983) (quoting *Oglala Sioux Tribe of Indians v. Andrus,* 603 F.2d 707, 714 (8th Cir.1979)) (describing "notice" function of Rule 8(a)(2)); *see generally* 5 C. Wright & A. Miller, Federal Practice and Procedure §§ 1202, 1215–16 (1969). In its opening remarks to the jury, the court stated, without objection, that the jury might "be called upon to decide what certain values with regards to the real estate and other items were at the time." Nationwide and the Estate each then proceeded to present some evidence of policy limits and estimated damage to the house and personal property—again without objection. Finally, just before instructing the jury, the court informed counsel that the "damage issue will be reserved and submitted to the same jury if necessary at a later time." Only at this point did Nationwide's counsel bring the asserted pleading deficiency to the trial court's attention, and counsel for the Estate immediately offered to make any necessary amendments. The court required no amendment and eventually decided the damage question on the merits. Given the parties' and the court's evident understanding at trial that the policy

proceeds were in issue, we reject Nationwide's argument that the pleadings were technically deficient to raise the matter.

■ At the same time, however, we are troubled by the district court's decision to take the damage issue away from the jury. In effect, the court directed a verdict in favor of the Estate "to the full extent of the policy limits," thus concluding that the Estate's damages exceeded the policy limits. Upon reviewing the evidence adduced at trial, however, we are constrained to conclude that such an action was unjustified.

As stated above, the parties did present some limited evidence regarding damages. It was established, for example, that the policy limit for a loss on the house was $79,580. The Estate introduced two estimates to restore the house, one of $105,000 and the other of $120,000; a Nationwide claims adjustor testified, however, that the damage was estimated at $78,601, a figure slightly below the policy limit. On this limited record, the divergent estimates appear to raise a genuine issue of fact as to the extent of damage to the house. Moreover, the insurance policy provided that the Company could elect to pay for the lesser of repairing or replacing the damaged structure, and testimony indicated that completely rebuilding may be less expensive. No evidence was taken, however, concerning the relative cost of rebuilding the Mays' home. In our view, these factual issues must be addressed before awarding a recovery "to the full extent of the policy limits."

The evidence was likewise insufficient to support a directed verdict for damage to personal property. The applicable policy limit was set at $43,768. The policy, however, covered losses to personal property only to the extent of actual cash value, which required reduction for depreciation. The Mays filed a "content loss" form purporting to detail over $62,000 in personal property lost in the fire, but no evidence was introduced concerning the effect of depreciation on the value of the covered property. Without such evidence, we again

conclude that the court's damage award was premature. Finally, we find virtually no evidence concerning the amount due to the Mays under the policy for their "loss of use" of the insured premises. The declarations page indicated a "loss of use" limit in excess of $79,200, but the record does not disclose whether the entire sum is due.

In view of these factual voids, we conclude that the district court erred in directing a verdict to the Estate "to the full extent of the policy limits." The truncated record before us does not support the court's conclusion that the Estate's losses exceeded the applicable policy limits. Accordingly, we reverse the district court's judgment insofar as it awarded damages to the Estate, and remand the case to the district court so that the issue of the policy proceeds may be fully aired.

## IV.

The district court judgment finding Nationwide liable to the Estate under the insurance policy is AFFIRMED; however, the court's damage award is REVERSED and that issue is REMANDED to the district court for further proceedings.