Lisa Kelly STONE, individually and as Administratrix of the Estate of Jeremy Stone, Deceased; and Hon. Dennis Bradley, Public Administrator of the Estate of Michael Howard Stone, Deceased Appellants,

v.

**KENTUCKY FARM BUREAU MUTUAL INSURANCE COMPANY, Appellee.**

No. 1999–CA–000410–MR.

Court of Appeals of Kentucky.

July 21, 2000.

Discretionary Review Denied by Supreme Court Jan. 17, 2001.

David L. Van Horn, Errol L. Cooper, Jr., Lexington, for Appellants.

Guy R. Colson, Michael E. Liska, Fowler, Measle & Bell, LLP, Lexington, for Appellee.

Before: BARBER, COMBS, and McANULTY, Judges.

## OPINION

McANULTY, Judge.

Lisa Kelly Stone, individually and as Administratrix of the Estate of Jeremy Stone, and Dennis Bradley, Public Administrator of the Estate of Michael Howard Stone (the appellants), appeal from an order of the Fayette Circuit Court entered on January 26, 1999, granting summary judgment to the appellee, Kentucky Farm Bureau Mutual Insurance Company. At issue is whether the appellee owes a duty to indemnify or defend the Estate of Michael Howard Stone from claims asserted as a result of the shooting death of 20–month–old Jeremy Stone. After reviewing the record, we affirm.

On March 25, 1994, Michael Howard Stone shot and killed his son Jeremy and then turned the gun on himself and committed suicide. The bodies were discovered in the upstairs bedroom of Michael's home in Lexington, Kentucky. Michael and his wife, Lisa Kelly Stone, had recently separated in January 1994 and a divorce action was pending. As part of the separation agreement, Lisa was given custody of Jeremy while Michael was granted visitation every other weekend.

In March 1995, Lisa, individually and as the Administratrix of the Estate of Jeremy Stone, filed a civil action in Fayette Circuit Court against the Estate of Michael Howard Stone seeking damages for the loss of affection and companionship of Jeremy, the destruction of Jeremy's power to labor and earn money, funeral expenses, and attorney fees. At the time the tragic events of this case took place, Michael maintained a homeowner's insurance policy through the appellee, which obligated it to defend and pay damages up to the policy limit "if a claim is made or a suit is brought against an insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies...."

As a result of the civil suit filed by Lisa, the appellee filed a declaratory rights action in circuit court to determine its rights and obligations under the homeowner's insurance policy. The appellee contended that it was not bound to indemnify or defend the Estate of Michael Howard Stone in the civil suit because the killing of Jeremy was not an "occurrence" as it was defined under the policy. In addition, the appellee pointed to Section II of the policy which specifically excluded personal liability for bodily injury "which is expected or intended by the insured[.]" In her answer, Lisa argued that the shooting was an "occurrence" and that the intentional act exclusion under the policy was not operative because Michael was mentally ill at the time of the shootings. The circuit court agreed with the appellee and granted its motion for summary judgment. This appeal followed.

The standard of review of a trial court's granting of summary judgment is "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, Ky.App., 916 S.W.2d 779, 781 (1996). We are to view the record in the light most favorable to the party opposing the motion and resolve all doubts in her favor. *Steelvest, Inc. v. Scansteel Service Center, Inc.*, Ky., 807 S.W.2d 476, 480 (1991). As a general rule, interpretation of an insurance contract is a matter of law for the court. *Morganfield National Bank v. Damien Elder & Sons*, Ky., 836 S.W.2d 893 (1992). While ambig-

uous terms are to be construed against the drafter and in favor of the insured, *Kentucky Farm Bureau Mutual Insurance Co. v. McKinney*, Ky., 831 S.W.2d 164 (1992), we must also give the policy a reasonable interpretation, and there is no requirement that every doubt be resolved against the insurer. *Motorists Mutual Ins. Co. v. RSJ, Inc.*, Ky.App., 926 S.W.2d 679 (1996). Finally, the terms should be interpreted in light of the usage and understanding of the average person. *Fryman v. Pilot Life Ins. Co.*, Ky., 704 S.W.2d 205 (1986).

In granting summary judgment, the circuit court merely stated that the "there [were] no genuine issues of material fact and that the appellee [was] entitled to judgment as a matter of law" without explaining specifically the grounds upon which it decided the motion. Therefore, as implied by appellants' arguments, we will address the grounds for summary judgment set forth in appellee's motion.

■ First, we must determine whether the shooting of Jeremy was an "occurrence" within the meaning of the homeowner's policy. The homeowner's policy defined "occurrence" as "an accident, including exposure to conditions, which results, during the policy period, in: a. bodily injury; or b. property damage." The policy did not further define the term "accident." In the context of an insurance policy, the word "accident" should be interpreted in accordance with its common usage. *Fryman v. Pilot Life Ins. Co.*, Ky., 704 S.W.2d 205 (1986). In construing the language of a life insurance policy, the court in *Fryman* held that "a death is accidental absent a showing that the death was a result of plan, design, or intent on the part of the decedent." *Id.* at 206.

Appellants argue that the term "occurrence" should be liberally construed in this case to extend coverage. To support their proposition, they cite *Brown Foundation, Inc. v. St. Paul Fire & Marine Insurance Company*, Ky., 814 S.W.2d 273 (1991). In that case, the Brown Foundation was or-

dered by the Federal Environmental Protection Agency to cleanup one of its wood preserving treatment facilities. The Foundation, which maintained several general liability policies, attempted to recover the cleanup cost from one of its insurance companies, St. Paul. St. Paul's general liability policy defined "occurrence" as "[a]n accident, including continuous or repeated exposure to conditions, which result in bodily injury or property damage, neither expected nor intended from the standpoint of the insured." *Id.* at 275. The court noted that the nature of the insurance policy suggested an expectation of maximum coverage and that the term "occurrence" was more expansive than the word "accident." *Id.* at 278. As for the "expected" or "intended" exception contained in the definition of "occurrence," the court determined that the insured must specifically and subjectively intend to cause injury in order for it to apply. *Id.* With regard to the issue of the Foundation's state of mind, the court stated:

> Certainly the circuit judge is not absolutely prohibited from inferring on summary judgment that an insured intended or expected damage regardless of whether the objective or subjective test is used. **In some cases, it is almost irrelevant whether an objective or subjective test is applied because of the circumstances.**

*Id.* at 277 (emphasis added). While the court in the *Brown Foundation* case ultimately decided that the issue of whether the Foundation subjectively expected or intended the environmental damage was a matter for the jury to decide, it specifically left open the possibility that a court could infer as a matter of law that the party expected or intended the injury under certain circumstances.

In a case involving a homeowner's insurance policy, this Court determined that the insurer did not have a duty to defend or indemnify the insured against allegations of sexual molestation because the criminal act of sexual molestation was not an "oc-

currence." *Thompson v. West American Insurance Company*, Ky.App., 839 S.W.2d 579 (1992). "Occurrence" was defined in the policy as "an accident, including exposure to conditions, which results, during the policy period, in bodily injury or property damage." The insured argued that even though the act giving rise to the injury (the act of sexual molestation) was intentional and the injury foreseeable, the *Brown Foundation* case required the insurer to show that he actually and subjectively intended or expected the injury to occur. In upholding the circuit court's award of summary judgment, this Court determined that the act of sexual molestation was not an "occurrence" and found that this was the type of circumstance alluded to in *Brown Foundation* where the court was justified in inferring an intent to harm as a matter of law from the nature of the act. Specifically, the *Thompson* court found that:

> "sexual molestation is so **inherently injurious**, or substantially certain to result in some injury, that the intent to injure, or the expectation that injury will result, can be inferred as a matter of law.... The emotional and psychological harm caused by sexual molestation is so well recognized, and so repugnant to public policy and to our sense of decency, that to give merit to a claim that no harm was intended to result from the act would be utterly absurd."

*Thompson*, 839 S.W.2d at 581 (emphasis added) (citations omitted).

As demonstrated by *Walker v. Economy Preferred Ins. Co.*, Ky.App., 909 S.W.2d 343 (1995), the inferred intent exception referred to in the *Brown Foundation* case and utilized in *Thompson* has been applied in a context other than sexual molestation. When Floyd Walker was severely injured in the eye by Brandon Mattingly, he filed a civil suit against Mattingly, Mattingly's grandmother, and the grandmother's insurance company, Economy Preferred. The trial court granted Economy Preferred's motion for summary judgment on the ground that the intentional act exclusion in the insurance policy applied to exclude coverage. Walker appealed to this court and argued that the evidence clearly indicated that while Mattingly intended to hit him, he did not intend to injure him. In affirming the judgment, this Court found "that the 'inherently injurious' act of punching someone in the face supports the trial judge's inference as a matter of law that Mattingly intended to injure Walker." *Id.* at 345. While we cited and relied on the *Thompson* case, support for the holding was also derived from other jurisdictions facing the same issue. *Citing Clark v. Allstate Insurance Co.*, 22 Ariz.App. 601, 529 P.2d 1195, 1196 (1975), we emphasized the following holding from the Arizona Court of Appeals:

> [T]he act of striking another in the face is one which we recognize as an act so certain to cause a particular kind of harm that we can say a person who performed the act intended the resulting harm, and his statement to the contrary does nothing to refute that rule of law. The fact that a state of mind is involved does not make summary judgment inappropriate.

*Id.*

■ Returning to the case *sub judice*, we believe that *Brown Foundation, Thompson,* and *Walker* provide a framework for our analysis. As in the *Thompson* case, we must determine whether the incident involved in this case is an "occurrence" for the purposes of extending coverage under a homeowner's insurance policy. As we noted earlier "occurrence" was defined within the policy as "an accident," and according to its plain meaning, an "accident" denotes something that does not result from a plan, design, or an intent on the part of the insured. *Fryman v. Pilot Life Ins. Co.*, Ky., 704 S.W.2d 205 (1986). While the only witness to the shooting of Jeremy was Michael himself, the evidence indicates that Michael pointed the rifle directly at Jeremy and shot him at close range. The resulting bodily harm,

or in this case death, cannot be conceived in any other way other than that which was the result of a plan, design, or intent. There is no doubt that pointing and firing a loaded rifle at Jeremy was an act "certain to cause a particular kind of harm ... ". *Walker v. Economy Preferred Ins. Co.,* Ky.App., 909 S.W.2d 343, 345 (1995), *quoting Clark v. Allstate Insurance Co.,* 22 Ariz.App. 601, 529 P.2d 1195, 1196 (1975). If a trial judge may infer intent to harm from the act of punching someone in the face, then *a fortiori,* a trial judge may infer intent to harm from the act of pointing and shooting a rifle at an infant at close range.

■ The appellants argue that due to Michael's depression, he lacked the mental capacity to act in accordance with reason and that he was incapable of forming an intent to harm. The issue regarding the applicability of the inferred-intent rule when there is a claim that the insured lacked the capacity to form any intent was discussed in *Goldsmith v. Physicians Ins. Co. of Ohio,* Ky.App., 890 S.W.2d 644 (1994). In that case, this Court again applied the inferred-intent rule in the context of an insurer's duty to defend and indemnify the insured in the face of sexual molestation allegations. However, unlike in *Thompson,* Goldsmith presented the additional issue of whether it was appropriate to infer intent when there is an assertion that the insured lacked the capacity to form any intent to harm. In concluding that the insured's capacity to form an intent was irrelevant, this court relied on *Wiley v. State Farm Fire & Casualty Co.,* 995 F.2d 457 (3 rd Cir.1993). Agreeing with the Third Circuit in *Wiley,* we adopted the following view:

> where an insured's conduct is both intentional and of such a nature and character that harm inheres in it, that conduct affords sufficiently clear demonstration of intent to harm subsuming any need for a separate inquiry into capacity. Once it is determined, strictly by examining the nature and charac-

ter of the act in question, that it is appropriate to apply the inferred intent rule, then the actor's actual subjective intent to harm or capacity to form that intent becomes irrelevant.

*Wiley,* 995 F.2d at 467 (citations omitted). Notwithstanding the possible application of the approach adopted in *Goldsmith,* we are guided by another case concerned with the law in Kentucky as it relates to insurance coverage and the acts of the mentally ill.

In *Nationwide Mutual Fire Insurance Co. v. May,* 860 F.2d 219 (6 th Cir.1988), the court concisely outlined the law on the intentional act exclusions in homeowner's insurance policies and the effect of the insanity defense thereon. Citing two old cases, *Bindell v. Kenton County Assessment Fire Ins. Co.,* 128 Ky. 389, 108 S.W. 325 (1908) and *Corley v. Travelers' Protective Ass'n,* 105 F. 854 (6 th Cir.1900), the court correctly concluded that at one time, if an actor suffered from a mental defect that rendered him unable to understand the nature and quality of his acts, or unable to tell right from wrong, or unable to control his conduct, then the act was not considered intentional for the purposes of an intentional act exclusion in an insurance policy. The court, however, went on to explain that in a subsequent case, *Colonial Life & Accident Ins. Co. v. Wagner,* Ky., 380 S.W.2d 224 (1964), the insanity defense was "substantially narrowed." *May,* 860 F.2d at 225. According to the Sixth Circuit Court, the test after *Wagner* to determine whether an act was intentional hinged on whether the actor understood the physical nature of the consequences of his actions, regardless of whether he could discern right from wrong. *Id.*

In this case, there was substantial medical evidence to support the conclusion that Michael was capable of forming an intent to act and that he knew the nature and quality of his acts. Dr. Donald George, a psychiatrist who had evaluated Michael on February 10, 1994, believed that Michael was suffering from major depression and, in fact, had prescribed

him Prozac and Trazodone, two antidepressant medications. However, Dr. George also testified in his deposition that Michael had the capacity to understand the nature and quality of his acts and that there was no reason to believe that he did not know what he was doing at any particular time. Dr. Robert Granacher, a forensic psychiatrist, reviewed Michael's psychiatric record, medical history, including the toxicology report, and all of the investigative reports associated with the case and opined that (1) there was no evidence that Michael was incapable of forming an intent to act, (2) he had full knowledge of what he was doing at the time, and (3) he knew the nature and quality of his acts. Dr. Andrew Cooley, also a forensic psychiatrist, testified in his deposition that depression does not mean that a person is incapable of forming an intent to act, or that the person does not have full knowledge of what they are doing, or that they do not know the nature and quality of their actions. Based upon this evidence, the circuit court could have reasonably concluded that Michael understood the nature and quality of his actions. Therefore, we find that the circuit court did not err in granting the appellee's motion for summary judgment.

Based upon the reasons stated above, the Fayette Circuit Court judgment is hereby affirmed.

ALL CONCUR.