NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY,
Appellant,

v.

Betty PELGEN, Administratrix of the Estate of Charles R. Swope, Deceased; James R. Combs, Administrator of the Estate of Cloay Lou Swope, Deceased; Christopher Swope; Terry A. Ingram, Jr.; and Samantha Swope, Appellees.

No. 2006–CA–000749–MR.

Court of Appeals of Kentucky.

June 22, 2007.

Joint Motion to Dismiss Granted
Jan. 17, 2008.

Stephen D. Wolnitzek, Covington, KY, for appellant.

Milton S. Goff, III, Crescent Springs, William H. Schoettelkotte, Newport, R. Barry Wehrman, Covington, KY, for appellees.

Before STUMBO and VANMETER, Judges; PAISLEY,[1] Senior Judge.

*OPINION*

VANMETER, Judge.

Homeowners' insurance policies typically exclude policy coverage for actions intentionally caused by insureds. Under Kentucky precedent, certain actions by the insured give rise to an "inferred intent," regardless of the actor's actual intent, so as to preclude coverage. The issue we must address is whether the Campbell Circuit Court erred in failing to apply the inferred intent rule to an insured who killed his wife at a time when it is alleged that he lacked the mental capacity to form intent. As we hold that the trial court erred, we reverse.

The facts are not in dispute. On February 18, 2004, at his home in Highland Heights, Kentucky, Charles R. Swope fatally shot his wife, Cloay Lou Swope, and then shot and killed himself. Some time prior to the incident, Cloay had moved out, and apparently the couple's marriage was floundering. While the record does not contain many details about the shooting, Cloay was outside at Charles' residence, the former marital home, when Charles retrieved a shot gun and shot Cloay twice, while she held their three-year-old daugh-

---

1. Senior Judge Lewis G. Paisley sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes (KRS) 21.580.

ter.[2] He then went inside and shot himself. The record does show that for several years preceding the tragic event, Charles suffered from mental illness manifesting in psychosis, delusions, auditory hallucinations and suicidal thoughts, and that his mental condition probably deteriorated further during the four to six months preceding the shootings.

At the time of their deaths, the Swopes were insured by a homeowners' policy issued by appellant, Nationwide Mutual Fire Insurance Company. Under the Personal Liability Coverage portion of the policy, Nationwide undertook to "pay damages an insured is legally obligated to pay due to an occurrence resulting from negligent personal acts or negligence arising out of the ownership, maintenance or use of real or personal property." "Occurrence" was defined in the policy as "bodily injury or property damage resulting from an accident[.]" Appellee, Betty Pelgen, as the administratrix of Charles' estate, sought personal liability coverage under the terms of the policy. Nationwide denied personal liability and medical coverage under the policy's stated exclusion for bodily injury "caused intentionally by . . . an insured, including willful acts the result of which the insured knows or ought to know will follow from the insured's conduct." Nationwide also claimed the applicability of an exclusion from liability for acts which are "criminal in nature and committed by an insured . . . regardless of whether the insured is actually charged with, or convicted of a crime."

In November 2004, Nationwide filed the instant action seeking a declaratory judgment addressing the applicability, if any, of the exclusions. After the filing of various pleadings, the parties were heard on March 6, 2006. The following day, the Campbell Circuit Court rendered an opinion holding that Nationwide could not rely on either policy exclusion to deny coverage for the harm resulting from Swope's acts. Key to the basis for the ruling was the court's finding that "[n]o one disputes that Mr. Swope lacked the capacity to understand the physical nature of the consequences of his actions. He could not form any intent." Based on that finding, the court rejected Nationwide's argument that Pelgen's claim for coverage was barred by the inferred intent rule, which states that intent is inferred where the conduct is certain to cause harm. This appeal followed.

Nationwide now argues that the circuit court erred in determining that neither policy exclusion was applicable to the facts at bar. It maintains that the court abused its discretion in rejecting the applicability of the inferred intent rule, and argues that the rule rendered Swope's mental capacity irrelevant. Nationwide therefore does not specifically challenge the lower court's finding in regard to Swope's mental capacity to form intent. Nationwide also claims that the court erred by finding that the "criminal in nature" exclusion was ambiguous and therefore did not bar Pelgen's claim of coverage. In sum, it maintains that homeowners' policies are not offered to provide coverage when an insured kills his or her spouse, and that the circuit court erred in failing to so rule.

In *Colonial Life & Accident Ins. Co. v. Wagner*, 380 S.W.2d 224, 226–27 (Ky.1964), Kentucky's highest court discussed whether an actor could form the intent to cause an intentional injury under a similar life insurance policy provision which excluded

---

**2.** The appellees' brief states that the daughter was two years old at the time of the shootings, but the pleadings in the record state her birth date as August 10, 2000, indicating she was three.

from coverage deaths resulting from intentional injuries. The court stated:

> The main question in this case involves the proper interpretation of the exclusionary clause above quoted. The insurance company evidently undertook to assure only against accidental injuries or death or natural death. It did not insure against death from intentional injuries.
>
> In law, there are many conditions under which a person may intentionally kill and not be subject to criminal punishment. A man may kill in self-defense. A soldier may kill under liberal rules. The executioner may kill with the sanction of the State. All of this destruction is intentional, but excusable. Similarly a person may be excused from penalty if he is insane at the time he commits a criminal act. He may do the act with every intention of consummating it, but if it is shown that he was mentally insufficient, he is excused from the imposition of the usual sanctions. The absence of punishment, however, does not retrospectively expunge the original intention.

In *Deloache v. Carolina Life Insurance Company*, 233 S.C. 341, 104 S.E.2d 875 [ (1958) ], a suit was brought on a double indemnity policy which contained an exclusion of double benefits in cases where the injuries were intentionally inflicted by another person. The facts were these: Deloache died from injuries inflicted by Burnett. Five days after the shooting, Burnett was committed to the South Carolina State Hospital. He was found to be mentally ill. The physician testified that a person mentally ill could intentionally do a thing even though he did not know right from wrong. He could intend to do a thing, but he was not responsible for doing it. The court held that under the policy, it did not matter whether Burnett was mentally or legally responsible for the act because the injuries which resulted in the death were intentionally inflicted by another person and, therefore, the accidental death benefits provision of the policy did not apply.

The court in *Colonial Life* reversed the jury verdict in favor of the plaintiff, stating that whether the actor was insane was, in essence, irrelevant, since "under the terms of the policy the act was intentional and therefore specifically excluded from coverage." *Id.* at 227.

*James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273 (Ky.1991), laid the foundation for the inferred intent rule by noting that one could reasonably infer from the actor's conduct that he intended the injury. The court held in relevant part that if the insured did not actually and subjectively intend or expect the injury, coverage was provided even though the action giving rise to the injury itself was intentional and the injury foreseeable. However, the court stated that "[c]ertainly the circuit judge is not absolutely prohibited from inferring on summary judgment that an insured intended or expected damage regardless of whether the objective or subjective test is used. In some cases, it is almost irrelevant whether an objective or subjective test is applied because of the circumstances." *Id.* at 277.

The following year, this notion was expanded in *Thompson v. West Am. Ins. Co.*, 839 S.W.2d 579 (Ky.App.1992). The court in *Thompson* held that in sexual molestation cases, the resultant psychological damage to victims is so foreseeable that one may *always* infer intent to harm. "The emotional and psychological harm caused by sexual molestation is so well recognized, and so repugnant to public policy and to our sense of decency, that to

give merit to a claim that no harm was intended to result from the act would be utterly absurd." *Id.* at 581, citing *Horace Mann Ins. Co. v. Leeber,* 180 W.Va. 375, 376 S.E.2d 581 (1988).

Finally, in *Goldsmith v. Physicians Ins. Co. of Ohio,* 890 S.W.2d 644 (Ky.App.1994), a panel of this court considered the question of whether the inferred intent rule could be applied in a sexual abuse case in which the insured asserted an incapacity to form the intent to harm the victim; if intent could be inferred, the act would be considered volitional and not covered under the terms of the policy. Finding that intent could be inferred, this court adopted the rationale of the Third Circuit Court of Appeals and stated that,

> where the insured's conduct is both intentional and of such a nature and character that harm inheres in it, that conduct affords a sufficiently clear demonstration of intent to harm subsuming any need for a separate inquiry into capacity. Once it is determined, strictly by examining the nature and character of the act in question, that it is appropriate to apply the inferred intent rule, then the actor's actual subjective intent to harm *or capacity to form that intent* becomes irrelevant.

*Id.* at 646, quoting *Wiley v. State Farm Fire & Cas. Co.,* 995 F.2d 457, 465 (3rd Cir.1993) (emphasis added). We acknowledge that the *Goldsmith* opinion added a caveat, providing that in order to prevent "misunderstanding, we reapply the inferred-intent rule in this specific category of insurance law involving acts of child molestation cases 'without displacing a subjective or objective intent standard in other categories of liability insurance cases.'" *Id.,* quoting *Wiley,* 995 F.2d at 464.

The question then becomes whether the *Goldsmith* holding may be applied outside the scope of sexual abuses cases to the facts herein. We answer this affirmatively. We recognize that the court in *Goldsmith* stated that its application of the inferred intent rule was limited to the arena of sexual abuse cases, based upon (1) the insidious nature of the resultant psychological harm to the victim and the difficulty or impossibility of objectively proving that harm, (2) its conclusion that psychological harm is a ubiquitous result of sexual abuse, and (3) its finding that public policy demanded the inference of intent to harm irrespective of the actor's ability to actually form that intent. As some homicide offenses are more severely punished than some sexual molestation offenses, *see* KRS Chapter 507, KRS Chapter 510, and KRS 532.060(2)(c), it seems illogical to us that the inferred intent rule would apply to sexual molestation cases notwithstanding the actor's ability to form intent, but not to cases involving the loss of life.

The inferred intent rule is supported by sound public policy principles, in part because it removes from the trial court the burden of determining an actor's thought process when engaging in conduct resulting in harm. That is to say, in certain circumstances one may reasonably infer from the facts that the actor intended the harm, without needing to resort to proof of that intent. In fact, in the unpublished opinion rendered in *James v. Kentucky Farm Bureau Mut. Ins. Co.,* 2002–CA–1738–MR, 2002–CA–1739–MR (Ky.App. Dec. 12, 2003), this court cited to *Stone v. Kentucky Farm Bureau Mut. Ins. Co.,* 34 S.W.3d 809, 813 (Ky.App.2000), in holding that "to give merit to a claim that no harm was intended to result from the act of shooting a loaded weapon into a crowd of people or that such an act was accidental would be unsound[.]" *James,* slip op. at 12.

We believe it would be similarly unsound to hold that Swope acted unintentionally when he deliberately pointed a gun at his wife's face, pulled the trigger, and then took the same gun and shot himself. As noted above, the couple was estranged, their relationship was subject to ongoing strife, Swope retrieved a shotgun from the house, and he used it on his wife, the person with whom he was in conflict. Regardless of whether he was psychotic or unable to appreciate right from wrong, his state of mind obviously was such that he was able to act deliberately and intentionally with respect to Cloay. Additionally, he had sufficient presence of mind not to shoot his daughter whom his wife was holding or any other family members or neighbors who may have been in the area. We conclude, therefore, that the Campbell Circuit Court erred in failing to apply the inferred intent rule.

The facts in this case are truly horrific, and we greatly sympathize with the Swope family and children. However, as noted by the court in *Walker v. Economy Preferred Ins. Co.*, 909 S.W.2d 343, 346–47 (Ky.App.1995), we cannot say that Nationwide "contracted to provide coverage in instances like the one at bar. We must give the policy its plain meaning and are constrained from enlarging the risks contrary to the natural and obvious meaning of the insurance contract."

Since we hold that the intentional action exclusion served to bar the claim under the terms of the policy, we need not address Nationwide's argument concerning the policy exclusion for actions which are "criminal in nature."

For the foregoing reasons, we reverse the order of the Campbell Circuit Court, and remand to that court with direction to grant Nationwide's motion for a declaratory judgment in its favor.

PAISLEY, Senior Judge, concurs.

STUMBO, Judge, dissents and files separate opinion.

STUMBO, Judge, dissenting.

Respectfully, I must dissent. The inferred intent rule is supported by sound public policy principles, in part because it removes from the trial court the burden of determining what an actor was thinking when he or she engaged in conduct resulting in harm. That is to say, in certain circumstances one may reasonably infer from the facts that the actor intended the harm, without resorting to proof of that intent. But we cannot go so far, however, as to conclude that one may infer intent *where the actor is incapable of understanding the physical nature of the consequences of his actions.* Stated differently, intent may not be inferred where the actor is incapable of forming intent. This should be axiomatic, and forms the basis for my conclusion that the Campbell Circuit Court did not err in failing to apply the inferred intent rule in the matter at bar.

I recognize that *Goldsmith* reaches a different result. The *Goldsmith* opinion, however, was very clear that its application was limited to the arena of sexual abuse cases. It based this limitation on the insidious nature of the resultant psychological harm to the victim and the difficulty or impossibility of objectively proving that harm. It concluded that psychological harm is a ubiquitous result of sexual abuse, and found that public policy demanded the inference of intent to harm irrespective of the actor's ability to actually form that intent.

The *Goldsmith* opinion remains applicable to sexual molestation and other sexual abuse scenarios, but having studied the development of the inferred intent rule and the public policy reasons for its application, I believe that in cases other than

sexual molestation the inferred intent rule cannot be applied to show intent where the actor is objectively incapable of forming intent to harm or of understanding the physical nature of the consequences of his actions. I base this belief on the conclusion that—outside the sexual molestation genre—one may not infer intent where it is demonstrated that the actor is incapable of forming intent. Accordingly, I would affirm the Campbell Circuit Court on this issue.

Nationwide also argues that the trial court erred in finding that the "criminal in nature" exclusion is ambiguous and cannot be applied to the facts at bar. It notes that under the terms of the policy, the exclusion is applicable regardless of whether the insured is actually charged with or convicted of a crime. It also maintains that coverage for Mr. Swope's conduct is barred irrespective of whether he was able to appreciate the consequences of his acts, and argues that the rule of strict construction against an insurance company does not mean that every doubt must be resolved against it.

The phrase "criminal in nature" is not defined in the insurance policy, and the circuit court found it to be ambiguous. To resolve the ambiguity, the court relied in part on KRS 504.020(1), which states that a person is not responsible for criminal conduct if, at the time of the conduct and as a result of mental illness, he lacks the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. This leads to the question of whether an act is "criminal in nature" if the statutory law does not hold the actor culpable for it. The circuit court answered this question in the negative, and I agree with this conclusion. Without a contractual definition of what constitutes "criminal in nature," in this context the statutory law and associate case law pro-

vide a reasonable basis for concluding that Mr. Swope's acts are not encompassed by the exclusion. This is especially true in light of canon stating that insurance policy exceptions, where ambiguous, are to be strictly construed to make the insurance effective. *Kentucky Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164 (Ky.1992). While Nationwide correctly notes that this rule does not mean that *every* doubt must be resolved against it, *Brown v. Indiana Ins. Co.*, 184 S.W.3d 528 (Ky.2005), the circuit court's interpretation of the phrase in light of KRS 504.020(1) was proper, and I would find no error.