**KENTUCKY FARM BUREAU MUTUAL INSURANCE COMPANY, Appellant,**

v.

**William Leslie COYLE; Martha Tweed; Michael David Elliott, Appellee.**

**No. 2006–CA–001335–MR.**

Court of Appeals of Kentucky.

May 16, 2008.

Discretionary Review Denied by Supreme Court May 13, 2009.

---

R. Keith Bond, Elizabethtown, KY, for appellant.

Douglas E. Miller, Radcliff, KY, for appellee Michael David Elliott.

Teresa E. Logsdon, Elizabethtown, KY, for appellee William Leslie Coyle.

Before ACREE and LAMBERT, Judges; HENRY,[1] Senior Judge.

HENRY, Senior Judge (Assigned).

Kentucky Farm Bureau Mutual Insurance Company appeals from a judgment entered upon a jury verdict holding that a homeowner's policy issued in the name of Martha Tweed applied so as to provide liability coverage in connection with an incident during which William Leslie Coyle, Tweed's husband, shot and injured Michael David Elliott. As an issue of fact,

---

**1.** Senior Judge Michael L. Henry sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statutes 21.580.

the jury determined that the shooting was not intentional, but was, rather, a product of negligence. For the reasons stated below, we reverse and remand for entry of a judgment in favor of Farm Bureau.

## FACTUAL AND PROCEDURAL BACKGROUND

Coyle and Tweed were married in 1999 and in January 2001 were living at a residence owned by Tweed in Boston, Kentucky, on Dones Lane. The residence was insured under a policy issued by Farm Bureau.

Tweed and Elliott were both employed at Ambrake and became acquainted as a result of being coworkers. According to Coyle, Elliott became attracted to Tweed and attempted to date her. Upon being rebuffed, Elliott began harassing her and Coyle. Acts of harassment included stalking her, vandalizing Coyle's and Tweed's property, and writing obscene messages concerning Tweed on traffic signs in the Dones Lane area. The harassment had been ongoing for about a year.

On January 19, 2001, Tweed and Coyle were at home when Coyle noticed Elliott driving by their residence. Coyle thereupon decided to confront Elliott, grabbed a Colt .22 pistol belonging to Tweed, and pursued Elliott. Coyle caught up with Elliott as he was entering the Bluegrass Parkway from Highway 62.

Coyle passed Elliott and pulled his vehicle in front of Elliott's vehicle, blocking it. Coyle exited his vehicle and walked toward Elliott's vehicle intending to confront him concerning the situation. Elliott, however, sped off around Coyle's vehicle and proceeded west toward Elizabethtown. As Elliott sped away, Coyle pulled the pistol from his jacket pocket and fired two shots at Elliott's vehicle. At least one of the shots struck Elliott's vehicle on this occasion. Coyle then reentered his vehicle and resumed his pursuit.

The chase continued until Elliott pulled into the parking lot of Lincoln Trail Elementary School in Elizabethtown with Coyle close behind. While attempting to turn around in the snow-covered school parking lot, Elliott slid into a chain link fence and came to a stop. Coyle pulled in behind Elliott, exited his vehicle, and approached Elliott's vehicle.

Elliott lowered a window on the drivers' side and Coyle walked around to the side of his vehicle under the assumption that Elliott was going to talk to him. As Coyle approached the side of the vehicle, however, Elliott again attempted to flee. Coyle thereupon fired two shots from the pistol through the open window of the vehicle, striking Elliott in the scapular area of his left shoulder. The bullet punctured and collapsed his lung. As further discussed below, the principal issue in this case is whether the shots Coyle fired at the elementary school were intended to strike Elliott, or were not intended to strike him but instead struck him "by accident."[2]

On January 9, 2002, Elliott filed a Complaint against Coyle in Hardin Circuit Court alleging the intentional torts of assault and battery. The Complaint also sought punitive damages. Coyle answered, denying liability, and filed a counterclaim alleging counts based upon

---

**2.** As a result of his conduct Coyle was indicted on one count of first-degree assault and five counts of first-degree wanton endangerment. Coyle eventually pled guilty to first-degree assault under extreme emotional disturbance and five counts of first-degree wanton endangerment. Coyle was sentenced to a total of seven years' imprisonment, probated for five years. For his conduct in harassing Tweed, Elliott pled guilty to first-degree stalking. He was sentenced to three years' imprisonment and received probation.

harassment, stalking, and outrageous conduct.

Eventually Tweed's Farm Bureau policy and its potential coverage came to light, and on September 17, 2003, Farm Bureau filed an intervening petition for declaration of rights seeking a declaratory judgment that the Tweed policy did not cover the events of January 19, 2001, and that it had no liability under the policy. Tweed was also added to the litigation as an intervening respondent.

Coyle was an "insured" under Tweed's insurance policy because he was a relative (her husband) living in her household. However, as relevant here, the policy's liability coverage extended only to an "occurrence," and an occurrence is defined in the policy as an "accident." Further, the policy had an exclusion to liability coverage which provides that the coverage does not apply to bodily injury or property damage "[w]hich is expected or intended by one or more 'insureds'."

On December 5, 2003, the trial court entered an order granting Elliott's motion to file an Amended Complaint. The Amended Complaint abandoned Elliott's intentional assault and battery claims and, instead, grounded his claims against Coyle upon a negligence theory. The Amended Complaint stated that "[Coyle] negligently discharged a weapon at Plaintiff's vehicle, striking Plaintiff," and that "[Coyle] breached his duty to use his handgun in a way that avoided injuries to Plaintiff." The Amended Complaint thus brought Elliott's claims within the scope of Tweed's Farm Bureau policy.[3]

On January 28, 2004, Farm Bureau filed a motion for summary judgment. The trial court denied the motion by order entered July 19, 2004. On September 20, 2005, Farm Bureau filed a second motion for summary judgment. The second motion was denied by order entered November 28, 2005.

The case was tried before a jury on March 1 and March 2, 2006. At the conclusion of the trial the jury was presented with the following two interrogatories:

A. Do you believe from the evidence that WILLIAM LESLIE COYLE intentionally fired a pistol at or in the general direction of MICHAEL DAVID ELLIOTT with the expected result of wounding/harming MICHAEL DAVID ELLIIOTT and was not an "accident" in the sense of being merely negligent and unintended?

B. Do you believe from the evidence that WILLIAM LESLIE COYLE understood the physical nature of the consequences of his actions and intended to shoot or expect to injure MICHAEL DAVID ELLIOTT upon discharge of the firearm on the date and at the time of the subject incident, and was not an "accident" in the sense of being merely negligent and unintended?

The jury answered "no" to both of the foregoing interrogatories, thus determining Coyle's shooting of Elliott to be an "accident" which was "merely negligent and unintended."

On March 8, 2006, the trial court entered final judgment adjudging that, because the shooting was an accident, Tweed's Farm Bureau policy did not pre-

---

**3.** As noted above, n. 2, one of the crimes to which Coyle pleaded guilty was first-degree assault under extreme emotional disturbance, an offense in which "intentionally causing injury or serious physical injury is an element of the offense;" *see* KRS 508.010 and 508.040.

No specific estoppel argument was advanced in this case, but the doctrine has found application in other cases. *See, e.g., Ray v. Stone,* 952 S.W.2d 220 (Ky.App.1997); *see also Parsley v. Kentucky Farm Bureau Mut. Ins. Co.,* 32 S.W.3d 103 (Ky.App.2000).

clude coverage of Coyle, and denying Farm Bureau's petition for a declaration of non-coverage.

On March 17, 2006, Farm Bureau filed a motion for judgment notwithstanding the verdict and/or a new trial. On June 5, 2006, the trial court entered an order denying the motion. This appeal followed.

## ENTITLEMENT TO SUMMARY JUDGMENT

■ Farm Bureau contends that it was entitled to summary judgment prior to the commencement of the trial. We agree.

Following the conclusion of discovery, *citing Stone v. Kentucky Farm Bureau Mutual Insurance Co.*, 34 S.W.3d 809 (Ky. App.2000), *Walker v. Economy Preferred Insurance Company*, 909 S.W.2d 343 (Ky. App.1995), and *Thompson v. West American Insurance Company*, 839 S.W.2d 579 (Ky.App.1992), Farm Bureau moved for summary judgment. In its motion, Farm Bureau argued that Coyle's conduct was so certain to have caused the type of harm which occurred that the shooting should be deemed intentional as a matter of law pursuant to the inferred intent doctrine as described in the foregoing cases. The trial court subsequently denied the motion.

■ The denial of a motion for summary judgment "is not reviewable on appeal from a final judgment where the question is whether there exists a genuine issue of material fact." *Transp. Cabinet, Bureau of Highways, Commonwealth of Kentucky v. Leneave*, 751 S.W.2d 36, 37 (Ky.App.1988). Further, "once the trial

begins, the underlying purpose of the summary judgment expires and all matters of fact and law procedurally merge into the trial phase, subject to in-trial motions for directed verdict or dismissal and post-judgment motions for new trial...." *Id.* at 38. However, there is an exception to this rule where: (1) the facts are not in dispute, (2) the only basis of the ruling is a matter of law, (3) there is a denial of the motion, and (4) there is an entry of a final judgment with an appeal therefrom. Then, and only then, is the motion for summary judgment properly reviewable on appeal. *Id.* at 37.

As further discussed below, we believe that the exception described in *Leneave* is applicable in this case, and that the trial court's denial of summary judgment is reviewable upon appeal.

Coyle was deposed two times prior to trial.[4] Our review of those two depositions discloses that, as argued by Farm Bureau, Coyle made admissions sufficient to bring this case within the inferred intent doctrine and, pursuant to that doctrine, Farm Bureau was entitled to summary judgment.[5]

In Elliott's December 17, 2003, deposition, the following exchange occurred:

Q. So you shot through the driver's window as he pulled away?

A. Yes, sir.

Q. And you know you did that?

A. Yes, sir.

Q. And then—which is what you intended to do?

A. Yes, sir.

---

4. On October 25, 2002, and on December 17, 2002.

5. While we have concluded that summary judgment should have been granted, we must acknowledge that the trial record contains substantial evidence in support of the verdict denying the exclusion. Despite his seemingly

inconsistent deposition testimony, Coyle testified at trial that he "never intended to shoot Mr. Elliott," that when he fired the shots he was "not thinking of hitting him with that bullet" and that at the time the shots were fired he did not even consider the possibility that the bullet would hit Elliott.

. . . .

Q. Okay. And again, you intended to discharge that bullet at Mr. Elliott?

A. Yes, sir.

Thus in the above exchange Coyle admitted that he intentionally and deliberately discharged a bullet at Elliott during the Lincoln Trail incident.

Similarly, Coyle testified as follows in his December 17, 2006, deposition:

Q. But you were conscious that you had pointed a gun at his car [at the Bluegrass Parkway exit] and pulled the trigger weren't you?

A. Yes, sir.

Q. I mean, you knew what you were doing?

A. Oh, yes, sir, yes, sir.

Q. And you intended to do what you did?

A. Yes, sir.

Q. And the same thing at Lincoln Trail. I mean, you intended to shoot at his car as it drove off, didn't you?

A. Yes, sir.

Thus in this exchange, Coyle admitted that he intended to shoot at the car occupied by Elliott in the course of the Lincoln Trial incident.

We acknowledge the rule "that if injury was not actually and subjectively intended or expected by the insured, coverage is provided even though the action giving rise to the injury itself was intentional and the injury foreseeable." *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 278 (Ky.1991), *reaffirmed, Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633, 639 (Ky.2007). However, there is an exception to this rule. We believe that exception is applicable here. That exception is the doctrine of inferred intent.

Although it could be said that Justice Palmore presaged the doctrine of inferred intent in *Graves v. Dairyland Ins. Group*, 538 S.W.2d 42 (Ky.1976), it was not examined *per se* in Kentucky law until five years later in *Willis v. Hamilton Mut. Ins. Co.*, 614 S.W.2d 251 (Ky.App.1981). *Willis*, like *Graves*, arose from an assault case. In *Willis*, after entry of a jury verdict and judgment finding the defendants guilty of assault, the plaintiffs amended their complaint to join Hamilton Mutual, which had a homeowner's policy covering one of the defendants. We held that the circuit court properly granted summary judgment in favor of Hamilton Mutual due to an exclusion in the policy for injury or damage which was "expected or intended" by the insured. The insurance company was not bound by the testimony of its insured, but could assert the result of the earlier trial regarding the insured's participation and intent. *Id.* at 252.

Ten years later in *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.*, an environmental damage case, the Supreme Court touched on the inferred intent rule, noting that one could infer from an actor's conduct that he intended the injury. The court reversed a summary judgment giving effect to an exclusion in the insurance policy and remanded for factual findings on the issue of whether the business owner intended or expected the resulting contamination. However, the court stated that "[c]ertainly the circuit judge is not absolutely prohibited from inferring on summary judgment that an insured intended or expected damage regardless of whether the objective or subjective test is used. In some cases, it is almost irrelevant whether an objective or subjective test is applied because of the circumstances." *Id.* at 277; *Nationwide Mut. Fire Ins. Co. v. Pelgen*, 241 S.W.3d 814, 816 (Ky.App.2007).

The majority of state jurisdictions typically applied the doctrine in the first instance to preclude insurance coverage where the insured sexually molested a child. *Goldsmith v. Physicians Ins. Co. of Ohio,* 890 S.W.2d 644, 646 (Ky.App.1994), *citing B.B. v. Continental Ins. Co.,* 8 F.3d 1288, 1293 n. 8 (8th Cir.1993) (noting unanimous consensus in 1993 among thirty-four states which held that in cases of sexual molestation or abuse of a minor, the harm resulting to the child was intended as a matter of law and a subjective test of intention is irrelevant). The reasoning is that "the act is considered a criminal offense for which public policy precludes a claim of unintended consequences, that is, a claim that no harm was intended to result from the act." *Goldsmith* at 646 (internal citation and additional bracketed language omitted).

Kentucky courts have applied the doctrine of inferred intent in the specific context of child molestation. *See Thompson v. West American Ins. Co.,* 839 S.W.2d 579, 580–81 (Ky.App.1992). However, they have not hesitated to apply the doctrine in other circumstances in which human experience tells us that the nature of the intentional act presumes an intention to do harm.

▪▪▪ We have applied the doctrine even where the insured established a mental incapacity that did not enable him to form an intent to cause harm.

[W]here the insured's conduct is both intentional and of such a nature and character that harm inheres in it, that conduct affords a sufficiently clear demonstration of intent to harm subsuming any need for a separate inquiry into capacity. Once it is determined, strictly by examining the nature and character of the act in question, that it is appropriate to apply the inferred intent rule, then the actor's actual subjective intent to harm or capacity to form that intent becomes irrelevant.

*Goldsmith* at 646 (internal citation and quotation marks omitted).

In *Stone v. Kentucky Farm Bureau,* a case with factual similarities to this case, we applied the doctrine of inferred intent where the insured pointed a rifle at another and pulled the trigger.

Michael pointed the rifle directly at Jeremy and shot him at close range. The resulting bodily harm, or in this case death, cannot be conceived in any other way other than that which was the result of a plan, design, or intent. There is no doubt that pointing and firing a loaded rifle at Jeremy was an act certain to cause a particular kind of harm[.]

*Id.* at 812, 813 (citation and internal quotation marks omitted).

We have applied the doctrine where the insured simply punched another in the face. *Walker v. Economy Preferred Ins. Co.* at 345. In *Walker,* the insured admitted intending to punch his victim. However, he argued on appeal that there should be coverage under the policy because testimony was "uncontradicted that he [the insured] did not intend to injure him [the insured's assaulted victim], and that under the principles espoused in ... *Brown Foundation,* [*supra,*] it was premature for the trial court to extinguish [the insurer's] obligation to provide coverage." *Walker* at 344. This Court disagreed, declaring that

this case presents one of those exceptions alluded to in *Brown Foundation,* and that the "inherently injurious" act of punching someone in the face supports the trial judge's inference as a matter of law that [the insured] intended to injure Walker.

*Walker* at 345; *accord Sigler v. Ralph,* 417 S.W.2d 239, 241 (Ky.1967)(Even absent in-

tent to harm, "use of a firearm under these circumstances was enough to justify a jury in inferring intent."). "If a trial judge may infer intent to harm from the act of punching someone in the face, then *a fortiori*, a trial judge may infer intent to harm from the act of pointing and shooting a [firearm] at an [individual] at close range." *Stone* at 813.

Finally, recently in *Nationwide Mut. Fire Ins. Co. v. Pelgen*, this Court applied the inferred intent doctrine to hold that coverage was not provided to a mentally ill insured who shot his wife and then killed himself. In *Pelgen* we stated "[t]he inferred intent rule is supported by sound public policy principles, in part because it removes from the trial court the burden of determining an actor's thought process when engaging in conduct resulting in harm. That is to say, in certain circumstances one may reasonably infer from the facts that the actor intended the harm, without needing to resort to proof of that intent." *Pelgen* at 817. By way of analogy *Pelgen* further noted that "to give merit to a claim that no harm was intended to result from the act of shooting a loaded weapon into a crowd of people or that such an act was accidental would be unsound[.]" *Id.*

We believe that this case presents a factual scenario best resolved by application of the doctrine of inferred intent. Pursuant to the inferred intent doctrine, Coyle's subjective intent to harm Elliott is irrelevant. Once Coyle admitted that he intentionally pointed his weapon at Elliott and that he "intended to discharge that bullet at Elliott[,]" we cannot avoid, except through a contorted logic, the determination: (1) that "the insured's conduct is both intentional and of such a nature and character that harm inheres in it," (2) "that it is appropriate to apply the inferred intent rule," and (3) that Coyle's "actual

subjective intent to harm … becomes irrelevant." *Goldsmith* at 646.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Kentucky Rules of Civil Procedure (CR) 56.03.

Coyle's pretrial admission to intentionally pointing a firearm at Elliott and intending further to discharge the bullet "at Elliott" establish that the Lincoln Trail incident was not an "occurrence" contemplated by even a liberal reading and broad application of the terms of the insurance policy. Based upon Coyle's admissions, and upon application of the inferred intent doctrine, there were no factual issues for resolution by a jury. Application of the inferred intent doctrine compels the result that Farm Bureau was entitled to summary judgment following the completion of discovery, and the case should not have proceeded to trial. Thus, the trial court erred by denying Farm Bureau's motion for summary judgment.

### OTHER ISSUES

Farm Bureau also contends that it was entitled to a directed verdict at the close of the appellees' evidence on the basis that Coyle's trial testimony was subject to only one interpretation and conclusion—that the shot that hit Elliott was an intentional act, and was not accidental or a product of negligence. Alternatively, Farm Bureau argues that it was entitled to a new trial because Elliott and Coyle collaborated on their jury strikes at the conclusion of voir dire.

Because of our disposition of this appeal, these issues are moot, and we need not discuss them upon the merits.

*CONCLUSION*

For the foregoing reasons the judgment of the Hardin Circuit Court is reversed and remanded for entry of judgment in favor of Farm Bureau.

ALL CONCUR.