RENDERED:  APRIL 23, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1397-MR

HBR MADISONVILLE, LLC                                    APPELLANT


                      APPEAL FROM HOPKINS CIRCUIT COURT
v.                    HONORABLE JAMES C. BRANTLEY, JUDGE
                      ACTION NO. 17-CI-00561


LORI ATTEBURY                                            APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, GOODWINE, AND JONES, JUDGES.

ACREE, JUDGE:  Lori Attebury brought suit against HBR Madisonville, LLC

("HBR"), claiming unlawful retaliation in violation of KRS[1] 216B.165 and

common-law wrongful termination.  A jury entered a verdict in her favor on both

claims.  HBR now appeals Hopkins Circuit Court's denial of its motions for

---

[1] Kentucky Revised Statutes.

summary judgment and a directed verdict. In addition, it raises evidentiary and jury instruction errors. Upon careful review, we affirm.

## BACKGROUND

HBR operates Hillside Center ("Hillside"), a nursing home facility in Madisonville, Kentucky. Hillside employed Attebury as a part-time licensed practical nurse in June 2016.[2] In October of that year, she converted to full-time.[3]

Attebury testified she was feeling ill prior to work on the morning of December 22, 2016. Nevertheless, she presented for work. Attebury was stationed in Wing Two of the facility but was asked to assist with a resident in Wing One. After assisting the resident, Attebury engaged in a heated argument with Courtney Faughender, a charge nurse who was allegedly upset that Attebury was treating one of her residents. Both parties exchanged profanities in the hallway in front of staff members and residents.

According to Attebury, she then returned to her nursing station, collected her belongings, and began walking toward the office of John Plunkett, Hillside's Director of Nursing, to seek permission to leave work early due to her illness. While walking toward Plunkett's office, she was allegedly approached by

___

[2] Attebury had been employed by Hillside on three separate occasions.

[3] Attebury's job performance from June 2016 to December 2016 was questionable. Hillside points to multiple occasions where Attebury provided deficient performance and, each time, she underwent a re-education program. Attebury, on the other hand, asserts she was considered a good employee.

-2-

A.J. Smith, a medical technician. Smith supposedly informed Attebury that Faughender had disposed of controlled narcotics in violation of Hillside's safety policy.

Hillside has a safety policy for the disposal of narcotics. According to the policy, "[t]wo licensed professionals are required to destroy and document destruction of controlled drugs." Smith allegedly told Attebury that Faughender was attempting to have other employees say they witnessed Faughender's disposal of the narcotics when, in fact, they had not. In addition, Hillside has a written policy requiring employees to report patient safety concerns, such as the improper disposal of narcotics. The policy forbids retaliation against those who make such reports.

According to Attebury, she entered Plunkett's office while he was in a meeting with two Hillside managers, Cassy Martin and Mary Capps. She voiced her displeasure with Faughender, informed Plunkett she was sick and needed to go home, and, in accordance with Hillside's policy, reported Faughender's patient safety violation. She testified that Plunkett "blew up" about the safety report and rebuked her, stating that "was a serious accusation," and "not to say something she'd regret, and that he could fire her for saying such." He then allegedly told her to leave immediately and slammed the door.

Plunkett refuted the specific facts of Attebury's story, but he did acknowledge that a heated conversation took place between them. He testified Attebury entered his office upset about an altercation with Faughender.[4] He stated one of the managers in his office told Attebury she could not leave simply because she was angry at Faughender. At this point, Attebury implied that "[Faughender] could take narcotics and [Cassy Martin] would cover it up for her." Plunkett told her that was a serious allegation and if she had any particular details she should tell him. He further testified that he told Attebury if she left it would be job abandonment and she could be fired.

Attebury left Plunkett's office and was walking toward the office of Tracey Butler, Plunkett's boss.[5] According to Plunkett, he was concerned that another dispute would arise between Attebury and Faughender, so he followed her. Plunkett described Attebury as being "belligerent," at which point he asked for her badge and suspended her. Attebury allegedly threatened Plunkett and left; Attebury denied making a threat.

After leaving the facility, Attebury texted Sharon Warren, the Regional Vice President of Hillside. On December 27, 2016, the parties spoke on

---

[4] Plunkett's testimony references a second dispute that supposedly took place between Attebury and Faughender, relating to Faughender providing late medication to a resident.

[5] Butler was not at work on the day of the incident.

the phone. Attebury detailed her suspension and reported her patient safety concern. In addition, she reported two other patient safety concerns relating to Faughender, one for the failure to treat a resident's skin tear and the other for failure to provide timely medication to one of her residents. Warren subsequently launched an investigation.

As part of her investigation, Warren interviewed twelve witnesses, including Attebury, Plunkett, Faughender, Martin, Capps, and Smith. She took notes and included witness statements in her investigation report. Significantly, Smith, who Attebury said was her source of information, denied telling Attebury that Faughender was improperly disposing of narcotics.

Warren completed her investigation on December 30, 2016, concluding Attebury's allegations could not be fully corroborated. Warren then phoned Attebury and terminated her. Warren explained Attebury's termination was based on "her statement and actions about leaving without permission as well as the verbal threat to [Plunkett]." (Record "R." 226-230.) Plunkett was issued a written reprimand and ordered to undergo additional management training. On December 29, 2016, the day before Warren's investigation was complete, Plunkett

placed an entry in Hillside's computer system that Attebury was terminated for job abandonment.[6]

Attebury brought suit against Hillside, alleging unlawful retaliation in violation of Kentucky's Patient Safety Act, KRS 216B.165, and common-law wrongful termination premised on the same statute.

Hillside moved for summary judgment, asserting five separate grounds. The trial court denied the motion. The case was tried before a jury. At the close of evidence, Hillside moved for a directed verdict; the motion was denied. The jury found in favor of Attebury on both her claims, awarding her $3,000 for lost wages, $75,000 for emotional distress, and $50,000 in punitive damages for her common-law wrongful termination claim. This appeal followed.

**ANALYSIS**

*Attebury's causes of action*

Attebury's claims are based, respectively, on statute and the common law. Her first cause of action alleges Hillside violated KRS 216B.165, which provides in pertinent part:

> (1) Any agent or employee of a health care facility or service licensed under this chapter who knows or has reasonable cause to believe that the quality of care of a patient, patient safety, or the health care facility's or

---

[6] Warren testified she did not inform Plunkett of her decision to terminate Attebury until the conclusion of her investigation on December 30, 2016. She could not explain why Plunkett entered her termination into the computer system one day prior.

-6-

service's safety is in jeopardy shall make an oral or written report of the problem to the health care facility or service, and may make it to any appropriate private, public, state, or federal agency.

If such report is made, the statute provides protection for the reporting employee:

(3) No health care facility or service licensed under this chapter shall by policy, contract, procedure, or other formal or informal means subject to reprisal, or directly or indirectly use, or threaten to use, any authority or influence, in any manner whatsoever, which tends to discourage, restrain, suppress, dissuade, deter, prevent, interfere with, coerce, or discriminate against any agent or employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of the health care facility or service the circumstances or facts to form the basis of a report under subsections (1) or (2) of this section. No health care facility or service shall require any agent or employee to give notice prior to making a report, disclosure, or divulgence under subsections (1) or (2) of this section.

KRS 216B.165(3).

Although a remedy is not provided in this statute, the remedy is found in "KRS 446.070, which states that '[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation.'" *Foster v. Jennie Stuart Med. Ctr., Inc.*, 435 S.W.3d 629, 634 (Ky. App. 2013) (quoting KRS 446.070).

To prevail on her statutory claim, Attebury first bore the burden of establishing a *prima facie* case of retaliation by showing: (1) she engaged in a statutorily defined protected activity; (2) Hillside knew about her protected activity; (3) Hillside took an adverse employment action against her because of it; and (4) there was a causal connection between the protected activity and adverse employment action. *See Colorama, Inc. v. Johnson*, 295 S.W.3d 148, 152 (Ky. App. 2009). If a *prima facie* case is established, "the burden shifts to [Hillside] to articulate a 'legitimate nondiscriminatory reason' for the termination decision." *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 497 (Ky. 2005) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000)).

If the employer produces a legitimate nondiscriminatory reason, the burden shifts back to Attebury to offer evidence that the proffered purpose was pretextual. *Id.* There are "three methods for establishing pretext: (1) the proffered reasons are false; (2) the proffered reasons did not actually motivate the decision; and (3) the plaintiff could show that the reasons given were insufficient to motivate the decision." *Id.*

Attebury's second cause of action is for common-law wrongful termination. The elements of this cause of action are:

1) The discharge must be contrary to a fundamental and well-defined public policy as evidenced by existing law.

2) That policy must be evidenced by a constitutional or statutory provision.

3) The decision of whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact.

*Foster*, 435 S.W.3d at 635 (quoting *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985)).

### *Summary Judgment*

Hillside sought summary judgment as to both Attebury's causes of action. Relevant to this appeal, it argues:

(1) Attebury's statutory claim fails because she had no personal knowledge of Faughender's alleged improper disposal of narcotics and, therefore, did not "know[] or [have] reasonable cause to believe that the quality of care of a patient, patient safety, or the health care facility's or service's safety is in jeopardy" as required by KRS 216B.165(1);

(2) Attebury's common-law claim fails because she did not file an external safety patient report implicating public policy; and

(3) Summary judgment should have been granted on Attebury's request for punitive damages because her claims do not support such an award.

We address each of these in context and in turn.

Generally, "[t]he denial of a motion for summary judgment 'is not reviewable on appeal from a final judgment where the question is whether there exists a genuine issue of material fact.'" *Kentucky Farm Bureau Mut. Ins. Co. v. Coyle*, 285 S.W.3d 299, 303 (Ky. App. 2008) (quoting *Transp. Cabinet, Bureau of Highways, Commonwealth of Ky. v. Leneave*, 751 S.W.2d 36, 37 (Ky. App. 1988)). And, "once the trial begins, the underlying purpose of the summary judgment expires and all matters of fact and law procedurally merge into the trial phase, subject to in-trial motions for directed verdict or dismissal and post-judgment motions for new trial . . . ." *Gersh v. Bowman*, 239 S.W.3d 567, 571 (Ky. App. 2007) (citations and internal quotation marks omitted).

> There is an exception to this rule, however, where:
>
> (1) the facts are not in dispute, (2) the only basis of the ruling is a matter of law, (3) there is a denial of the motion, and (4) there is an entry of a final judgment with an appeal therefrom. Then, and only then, is the motion for summary judgment properly reviewable on appeal.

*Id.* (citation omitted). "A fair synthesis of [this] rule provides that when the material facts were not genuinely disputed and summary judgment was denied purely as a matter of law, an order denying summary judgment is properly reviewable on an appeal from an adverse final judgment, the same as any other interlocutory ruling by the trial court on a question of law." *Auslander Properties,*

*LLC v. Nalley*, 558 S.W.3d 457, 463 (Ky. 2018) (citing *Gumm v. Combs*, 302 S.W.2d 616, 617 (Ky. 1957)).

Here, the facts material to Attebury's statutory and common-law claims were clearly in dispute. To name a few, the parties disputed the actual reason Attebury was terminated—whether it was due to her patient safety report or because she abandoned her job and threatened Plunkett, whether Attebury actually threatened Plunkett, and whether Attebury filed the patient safety report in good faith. Additionally, the trial court's order denying summary judgment does not set forth its rationale. Therefore, we have no way of knowing the grounds for its denial. Accordingly, prong one and two of the exception have not been met. We conclude that Hillside's first argument is not properly before us.

Hillside's last two arguments raise legal as opposed to factual questions. In the first of the two, Hillside argued that external reports are required before a common-law wrongful termination claim can be sustained—a legal question. As to the final argument, Hillside claims punitive damages cannot be awarded on Attebury's common-law claim because it is premised on a statute in which punitive damages are not available. Because there are no material facts in dispute relating to these two issues, the basis of the trial court's order necessarily must have been legal. Therefore, we will review these issues *de novo*.

-11-

Hillside directs us to two unpublished cases in support of its contention that external reports are required before a common-law wrongful termination claim can be sustained, *Zumot v. Data Management Company*, No. 2002-CA-002454-MR, 2004 WL 405888, at \*2 (Ky. App. Mar. 5, 2004), and *Airdrie Stud, Inc. v. Reed*, No. 2001-CA-001396-MR, 2003 WL 22796469, at \*4 (Ky. App. Nov. 26, 2003). Both cases involved plaintiffs who reported illegal activities to their private employers. The courts noted there was no statute requiring them to report such illegal activity. By making internal reports only to their private employers, the discharged employees neither furthered nor effected any public policy. *Zumot*, 2004 WL 405888, at \*2; *Airdrie*, 2003 WL 22796469, at \*3-4. Therefore, the employees could not sustain their wrongful discharge claims. *Id*.

The cases relied upon by Hillside are factually distinguishable from the case at bar and, contrary to its contention, do not stand for the proposition that "external reports must be made for common-law wrongful discharge claims." KRS 216B.165 states a healthcare employee "***shall*** make an oral or written report of the problem ***to the health care facility or service***, and ***may make*** it to any appropriate private, public, state, or federal agency." KRS 216B.165(1) (emphasis added). The plain language of the statute not only allows but mandates that safety concerns be reported internally to the health care facility. Because Attebury's

-12-

common-law claim is premised on this very statute, the filing of an internal report with Hillside directly furthered public policy, unlike in the cases cited by Hillside. Further, we see no substantive or policy-driven reason why an external report is necessary to sustain a common-law wrongful termination claim. We find this argument without merit.

Hillside's assertion that punitive damages are not available on Attebury's common-law wrongful termination claim is likewise without merit. Hillside argues that punitive damages are not available for a statutory violation of KRS 216B.165 and, therefore, they are also not available for common-law wrongful termination premised on the statute. We agree to the extent that punitive damages are not proper on Attebury's statutory claim. However, this does not prohibit punitive damages on her common-law claim.

As noted above, the authority for a private right of action for a violation of KRS 216B.165(3) is found in KRS 446.070, which only allows plaintiffs to recover "such damages as he sustained by reason of the violation . . . ." "Punitive damages are not 'damages sustained' by a particular plaintiff. Rather, they are private fines levied by civil juries to punish a defendant for his conduct and to deter others from engaging in similar conduct in the future." *In re Air Crash Disaster at Gander, Newfoundland, On Dec. 12, 1985*, 684 F. Supp. 927,

931 (W.D. Ky. 1987)).  Accordingly, Hillside is correct that punitive damages are not available on Attebury's statutory retaliation claim.

However, our Supreme Court, in *Hill v. Kentucky Lottery Corporation*, guides us to the conclusion that punitive damages remain available on Attebury's common-law claim.  327 S.W.3d 412 (Ky. 2010).  In that case, the plaintiffs sued the Kentucky Lottery Corporation for:  (1) unlawful retaliation in violation of KRS 344.280, Kentucky's Civil Rights Act; (2) common-law wrongful termination in violation of public policy; and (3) defamation.  *Id*. at 414.  That jury was instructed it could return a single award of punitive damages to each plaintiff if it found for them under any of the three claims of liability.  *Id*. at 430.  Similar to the issue before us, the plaintiffs' common-law claim was premised on the same conduct supporting their statutory claim.  The *Hill* Court held it was error to instruct the jury on punitive damages relating to their statutory claim.  However, punitive damages were "proper under the common law wrongful discharge claim . . . ." *Id*.  And, "because all of the conduct for which the jury might have awarded punitive damages for the civil rights violation was the same conduct for which such damages were properly awarded under the common law wrongful discharge claim, the instructional error was harmless." *Id*.

*Hill* stands, in part, for the proposition that punitive damages remain available on common-law wrongful termination claims even if punitive damages

-14-

are not recoverable on the independent statutory claim. The trial court recognized this and appropriately instructed the jurors that punitive damages may only be awarded if they found for Attebury on her common-law claim. Hillside directs us to no authority suggesting punitive damages are not available for common-law wrongful termination claims. We find no error by the trial court.

### *Directed Verdict*

Hillside moved for a directed verdict at the close of evidence. Before this Court, it asserts a directed verdict should have been entered in its favor on: (1) Attebury's statutory and common-law claims because she failed to establish causation and failed to rebut its honest-belief "defense"; (2) her claim for emotional distress damages because she failed to put forth an expert witness; and (3) her claim for punitive damages because she failed to prove such damages by clear and convincing evidence. These three claims of error are unpreserved.

"[A] motion for a directed verdict raises only questions of law as to whether there is any evidence to support a verdict." *Rothwell v. Singleton*, 257 S.W.3d 121, 124 (Ky. App. 2008) (quoting *Gibbs v. Wickersham*, 133 S.W.3d 494, 496 (Ky. App. 2004)). A directed verdict challenges whether there is sufficient evidence upon which a jury could base a finding in favor of the non-moving party.

It is settled that "[a] mid-trial motion for directed verdict alone is not adequate to preserve an insufficiency of the evidence claim." *Bryan v.*

*CorrectCare-Integrated Health, Inc.*, 420 S.W.3d 520, 524 (Ky. App. 2013). "In order to rely on a claim of insufficiency of the evidence, a party *must* preserve it through a motion for judgment notwithstanding the verdict, which in turn must be predicated upon a directed verdict motion made at the close of all the proof." *Id.*

Kentucky Rule of Civil Procedure ("CR") 76.12(4)(c)(v) requires appellants to include in their brief a "reference to the record showing whether the issue was properly preserved for review and, if so, in what manner." Hillside has not provided this Court with a reference to the record indicating that it followed its motion for a directed verdict with a motion for a judgment notwithstanding the verdict ("JNOV"). And, upon reviewing the record, this Court does not see where such a motion was made. Accordingly, because each of these three claims of error were unpreserved by a motion for JNOV, this Court will not address any of them.

***Investigation Report***

On August 7, 2019, after jury selection, the trial court asked whether Hillside intended to introduce Warren's investigation report during trial. Hillside expressed its intention to do so. The trial court *sua sponte* raised concerns that the investigation report may not fit within the business record exception to the hearsay rule and that it contained "double hearsay" because it included statements from twelve different witnesses. He then heard arguments as to its admissibility.

The following day, the trial court ruled the investigation report inadmissible.[7] In the final trial judgment, the trial court noted the report was not maintained in the regular course of business and, therefore, was not a business record. In addition, he concluded it was "double hearsay." (R. 600.) Hillside challenges the exclusion of the report on appeal.

"[W]e review a trial court's evidentiary determinations for abuse of discretion[.]" *Mason v. Commonwealth*, 559 S.W.3d 337, 339 (Ky. 2018). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000).

Hillside first argues that Attebury should be judicially estopped from challenging the admissibility of the investigation report because she previously relied on the report in her summary judgment motion and agreed that it was admissible prior to the trial court raising the issue. We disagree.

Judicial estoppel "can be applied to prohibit a party from taking inconsistent positions in judicial proceedings." *Hisle v. Lexington-Fayette Urban Cty. Gov't*, 258 S.W.3d 422, 434 (Ky. App. 2008).

> Although there is no absolute general formula for this principle, several factors have been recognized such as: (1) whether the party's later position is clearly inconsistent

---

[7] Hillside refers to several conferences that took place in the trial judge's chambers. However, these do not appear in the record and, therefore, we do not consider these conversations.

with its earlier position; (2) whether the party succeeded in persuading a court to accept the earlier position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 434-35.

Here, it was the trial court, not Attebury, that raised concerns about the investigation report's admissibility. It was well within the trial court's discretion, as the gatekeeper of evidence, to raise such concerns and exclude evidence it deemed inadmissible. And, it was not until the trial court raised its concerns that Attebury changed positions on the issue. Attebury clearly did not "persuade the court" to accept her initial position that the report was admissible. Additionally, she did not seek to derive an unfair advantage by initially taking the position that the report was admissible.

Further, the fact that Attebury relied on the investigation report in her summary judgment motion did not prevent her from challenging its admissibility at trial. Parties may rely on evidence that would normally be excluded at trial in pre-trial motions for summary judgment. We conclude the doctrine of judicial estoppel is not applicable given the circumstances.

Next, Hillside argues it should have been permitted to lay a foundation prior to an evidentiary ruling on the investigation report. Prior to the trial court's ruling, not only did Hillside argue why the report was a business

record, it further contended the report was not "double hearsay" because the individual statements within the report were being introduced for the non-hearsay purpose of showing why Warren took the action she took; *i.e.*, her state of mind and motive for terminating Attebury.

A foundation could have authenticated the report and helped to establish it as a business record, as Warren would have been granted the opportunity to testify as to whether these reports are made in the regular course of business. However, laying a foundation would not have helped the report overcome the rule against "double hearsay." The judge had already taken into consideration Hillside's argument. Therefore, allowing Hillside the opportunity to lay a foundation would not have presented any new arguments that could overcome the rule against "double hearsay." Accordingly, the trial court was within its discretion to make a ruling on the issue prior to trial beginning.

Last, Hillside contends the report should have been admitted for the truth of the matter asserted or, in the alternative, for the limited purpose of explaining Warren's state of mind and motive for terminating Attebury.

Because the investigation report is riddled with statements from twelve different witnesses, it clearly must overcome the rule against "double hearsay." "[H]earsay within hearsay, *i.e.* 'double hearsay,' is inadmissible unless

each part of the combined statements conforms with a recognized exception to the hearsay rule." *Manning v. Commonwealth*, 23 S.W.3d 610, 614 (Ky. 2000).

In its brief, Hillside merely indicates that the investigation report is a business record. However, it does not identify what exception to the hearsay rule qualifies for admission the individual hearsay statements within the report. Assuming the investigation report is a business record, it remains inadmissible for the truth of the matter it addresses.

With regard to Hillside's argument that the report should be admissible for the non-hearsay purpose of establishing Warren's state of mind and motive for terminating Attebury, we find merit. In essence, Hillside is asserting the report is a business record, and the individual statements contained within it are not hearsay, as they are not being admitted for the truth of the matter asserted. Assuming the report is a business record, we would agree the report is admissible.

Attebury's burden was to establish she was terminated for filing the patient safety report. In its defense, Hillside attempted to introduce this report to establish that she was instead terminated for job abandonment and threatening her supervisor. In other words, the individual statements within the report establish Warren's state of mind and motive for terminating Attebury, not the truth of its contents. Accordingly, the witness statements within the report relating to

-20-

Attebury's termination were not hearsay. *See Haughton v. Orchid Automation*, 206 F. App'x 524, 532 (6th Cir. 2006).

Nonetheless, we find any error harmless. At trial, Warren was able to testify, in depth, about her investigation and was allowed to review her investigation report to refresh her recollection. She noted the number of people she interviewed, their names, and her reasons for interviewing these specific individuals. Warren testified that after interviewing Smith, she was unable to substantiate Attebury's allegation that Smith told her Faughender was improperly disposing of narcotics. She was also unable to substantiate Attebury's allegation that Plunkett threatened to terminate her for reporting her patient safety concern. Further, she noted her inability to substantiate that Attebury was suffering from nausea, vomiting, and diarrhea on the day she allegedly abandoned her job.

Ultimately, she told the jury she concluded Attebury was leaving the facility on the day at issue without intent to give a report or communicate the status of the residents she was assigned that day and she threatened Plunkett. She testified this was considered gross misconduct and insubordination and made the determination to terminate her employment. In addition to Warren's testimony, four of the twelve witnesses whose statements were contained in the investigation report testified at trial. They were Plunkett, Capps, Martin, and Attebury. Each was questioned on the events of December 22, 2016.

-21-

Collectively, this was sufficient to present to the jury Warren's motive for terminating Attebury. Admission of the investigation report would have merely presented cumulative information.

It appears Hillside is primarily concerned that it was unable to introduce Smith's portion of the report denying Attebury's allegation that she told her Faughender was improperly disposing of narcotics. However, as noted above, Warren testified she was unable to substantiate this claim after interviewing Smith. Thus, the jury already had this information. Additionally, Smith's written statements in the report regarding Faughender's alleged safety violation do not relate to Warren's motive for terminating Attebury for job abandonment and threatening her supervisor. Hillside presents no other non-hearsay purpose for which Smith's statements should have been admitted. Accordingly, they remain inadmissible hearsay. We find no reversable error.

### *Jury Instructions*

Hillside next argues the trial court erred by failing to instruct the jury on its "honest belief" defense and "business-judgment presumption." When determining whether the trial court erred by not giving a jury instruction that was required by evidence, our review is whether the trial court abused its discretion. *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015).

It is well-settled that "Kentucky law mandates the use of 'bare bones' jury instructions in all civil cases." *Olfice, Inc. v. Wilkey*, 173 S.W.3d 226, 229 (Ky. 2005). Bare-bones instructions simply frame "what the jury must believe from the evidence in order to return a verdict in favor of the party who bears the burden of proof." *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 824 (Ky. 1992). This includes an instruction on defenses supported by the evidence.

We note there is no "honest belief" defense that would entirely shield Hillside from liability for a retaliation claim. Instead, it is merely a rule associated with the second step of the burden-shifting framework. This rule holds, "[a]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual by showing it was ultimately incorrect." *Moore v. U.S. Bank Nat'l Ass'n, Inc.*, No. 2015-CA-001602-MR, 2017 WL 2492080, at *7 (Ky. App. Jun. 9, 2017) (quoting *Winchester v. City of Hopkinsville*, 93 F. Supp. 3d 752, 761 (W.D. Ky. 2015)).

Consequently, this rule only protects an employer if the plaintiff is attempting to establish pretext by presenting evidence that the employer's reason is "mistaken, foolish, trivial, or baseless." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 286 (6th Cir. 2012) (citation omitted); *see Bruce v. Levy Premium Foodservices Ltd. P'ship of Tennessee*, 324 F. Supp. 3d 962, 971 (M.D. Tenn.

-23-

2018) (quoting *Joostberns v. United Parcel Servs.*, Inc., 166 F. App'x 783, 794, n.5 (6th Cir. 2006)) ("The harmless belief rule . . . only prevents [a plaintiff] from establishing pretext through the 'falsity of the reason offered' method; an employee can still establish pretext through the other two prongs, actual and insufficient motivation.").

Accordingly, the trial court was not required to include this rule in the jury instructions. Instead, it was the role of counsel "to flesh out during closing argument" the application of this rule to the facts. *Olfice*, 173 S.W.3d at 230.

Likewise, the trial court was not required to provide a "business-judgment" instruction. Hillside directs us to two unpublished cases, which suggest that "[a plaintiff] cannot prevail on his discrimination claim merely questioning the soundness of [his employer's] business judgment or practices." *Flock v. Brown-Forman Corp.*, 344 S.W.3d 111, 117 (Ky. App. 2010); *see also Thompson v. Louisville Metro Gov't*, No. 2011-CA-001092-MR, 2013 WL 191878, at *4 (Ky. App. Jan. 18, 2013). Instead, a plaintiff must show that his engagement in a protected activity was a motiving factor in the employer's adverse employment decision. *See id.*

Hillside contends this creates an "evidentiary presumption" upon which the jury should have been instructed. But, our Supreme Court held:

> bare-bones instructions do not include unnecessary detail such as evidentiary presumptions . . . . evidentiary

-24-

presumptions should not be included in Kentucky jury instructions because presumptions, by their nature, are "guides to be followed by the trial judge in determining whether there is sufficient evidence to warrant the submission of an issue to the jury[.]"

*Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696, 723 (Ky. 2020) (quoting *Mason v. Commonwealth*, 565 S.W.2d 140, 141 (Ky. 1978)).

Accordingly, the trial court did not err by rejecting these proposed jury instructions.

### *Limiting Instruction*

The trial court allowed Attebury to testify about Smith's alleged statements claiming Faughender had improperly disposed of narcotics. The testimony was allowed only for the limited purpose of showing why Attebury made the report. However, at trial, a limiting instruction was not given to the jury. Hillside claims this was error.

Although Hillside objected to the admissibility of the testimony, it does not identify how or whether it requested a limiting jury instruction. "[A]n admonition restricting the scope of admissible evidence is available 'upon request,' and in the absence of such a request, the trial court's failure to provide one cannot be regarded as grounds for appeal, subject to the exception of palpable error review for manifest injustice under CR 61.02." *MV Transp., Inc. v. Allgeier*, 433 S.W.3d

324, 332 (Ky. 2014).  Hillside does not request palpable error review.

Accordingly, Hillside has no grounds to appeal this issue.

## **CONCLUSION**

For the foregoing reasons, we affirm the judgment upon jury verdict

of the Hopkins Circuit Court.

ALL CONCUR.


BRIEF FOR APPELLANT:                    BRIEF FOR APPELLEE:

LaToi D. Mayo                           Brent T. Ackerson
Jay Inman                               Louisville, Kentucky
Lexington, Kentucky